ROWLEY, President Judge:
 

 Antrim Mining, Inc. (hereinafter “Antrim”) appeals from a trial court order sustaining preliminary objections in the nature of a demurrer filed by the Pennsylvania Insurance Guaranty Association (hereinafter “PIGA”). The main issue which has been presented for our review is whether the trial court
 
 *524
 
 erred in deciding that PIGA was not liable for the failure of Antrim’s insurance carrier to defend or indemnify Antrim against a suit brought by the Pennsylvania Environmental Defense Foundation (hereinafter “PEDF”) after Antrim’s insurance carrier became insolvent. In deciding this issue, we have carefully reviewed the record and the relevant legal principles, and we now conclude that the trial court did not err. Accordingly, we affirm the trial court’s order sustaining PIGA’s preliminary objections in the nature of a demurrer.
 

 The factual and procedural background of this case is as follows: At all times relevant to this appeal, Antrim operated a surface mining concern in Tioga County, Pennsylvania. In the course of its mining operation, Antrim purchased several insurance policies from Rockwood Insurance Company (hereinafter “Rockwood”). Specifically, in 1988, Antrim purchased a Commercial General Liability Policy (hereinafter “CGL policy”) covering the period of January 1,1988 to January 1,1989, which was then renewed for the period of January 1,1989 to January 1, 1990. Antrim also bought a Pollution Liability Insurance Policy (hereinafter “POL policy”) which covered the period from January 1, 1988 to January 1, 1989. The CGL policies carried coverage limits of $600,000.00 per occurrence and a $1,000,000.00 aggregate limit, while the POL policy coverage was limited to an aggregate of $500,000.00, as well as a per occurrence limit of $500,000.00.
 

 The portion of Antrim’s surface mining operations which are relevant to this appeal were located on top of a large underground mine complex, which had been operated during the late 1800’s and early 1900’s by mining companies other than Antrim. The underground mine complex measures between 1,200 and 1,500 acres. Antrim does not own the underground mine complex, but only the right to mine coal on the surface of the land above that complex. Antrim’s surface mining operation is connected with the underground mine complex by Antrim Deep Mine Tunnel Number One. A polluting discharge of mine drainage has flowed by force of gravity from the mouth of the underground mine complex into the Babb’s
 
 *525
 
 Creek Watershed since before the commencement of Antrim’s surface mining operations.
 

 On December 2, 1988, PEDF, a non-profit organization of approximately 70 members which exists for the purpose of conserving and maintaining the environment in Pennsylvania, gave notice to Antrim that it intended to file suit against the mining concern pursuant to the Federal Clean Water Act (hereinafter “FCWA”), 33 U.S.C. § 1365
 
 et seq.,
 
 and the Pennsylvania Clean Streams Law (hereinafter “CSL”), 35 P.S. § 691.601
 
 et seq.,
 
 because, allegedly, Antrim’s surface mining operation had further polluted the existing underground mine complex discharge without the proper discharge permits.
 

 An amended complaint was filed by PEDF against Antrim on August 26, 1989. Antrim, in turn, notified its liability insurance carrier, Rockwood, of the PEDF claim; but Rock-wood refused to defend and/or indemnify Antrim in that action because it maintained that the PEDF claim was not within the coverage provided by any of the Rockwood policies.
 

 Thereafter, on January 12, 1990, Antrim entered into a Modified Consent Decree with the PEDF, which was approved by the United States District Court for the Middle District of Pennsylvania. In the decree, Antrim agreed to the following:
 

 (1) to pay $10,000.00 to the United States Treasury for civil penalties;
 

 (2) to cause payments to be made to the Babb’s Creek Watershed Pollution Abatement Fund;
 

 (3) to pay $25,000.00 to the Babb’s Creek Fund to provide immediate funding for a water quality improvement project on the Babb’s Creek Watershed and to make payments of $.25 per ton of waste disposed of at certain waste disposal facilities;
 

 (4) to pay $17,500.00 to PEDF in full and complete settlement of the costs and fees incurred by PEDF in this matter;
 

 (5) to cease coal extraction on areas overlaying the underground mine complex;
 

 (6) to immediately commence reclamation of its surface mining operations;
 

 
 *526
 
 (7) to complete backfilling of affected areas and to plant trees to complete the reclamation of that area; and
 

 (8) to monitor and sample the water flowing from the underground mine complex on a quarterly basis, and if necessary, to select and implement abatement or treatment projects if the quality of the water should deteriorate any further.
 

 In August of 1991, Rockwood, Antrim’s insurance carrier, was declared insolvent and the company was liquidated; PIGA then undertook the adjustment and payment of Rockwood’s claims. Antrim filed suit on May 8, 1992 against PIGA, pursuant to 40 P.S. § 1701.201(b). Also named in the suit were Rockwood, and the Pennsylvania Insurance Commissioner, Cynthia Maleski. In this action, Antrim sought to recover damages suffered by it in settlement of the PEDF claim. PIGA filed preliminary objections to Antrim’s complaint on June 17, 1992 and on August 7, 1992, Antrim filed an amended complaint.
 

 On August 26, 1992, PIGA filed preliminary objections to Antrim’s amended complaint, as well as a praecipe requesting the prothonotary to list the matter for oral argument. In its preliminary objections to Antrim’s amended complaint, PIGA claimed,
 
 inter alia,
 
 that coverage of the PEDF claim is excluded by the terms of the Rockwood insurance policies. Thereafter, on September 9, 1992, the parties filed a stipulation that the action filed by Antrim would be discontinued as to Rockwood and Cynthia Maleski. On October 30, 1992, Antrim filed a memorandum in opposition to PIGA’s preliminary objections. PIGA’s preliminary objections in the nature of a demurrer were ultimately sustained by the trial court on August 13, 1993, and Antrim then timely filed the instant appeal contending that the trial court abused its discretion and erred as a matter of law by deciding that the CGL and POL policies did not provide coverage with regard to the PEDF action against Antrim.
 

 Initially, we note the standard of review to which we must adhere in this case, as it has been previously stated by this Court:
 

 
 *527
 
 In reviewing an order sustaining preliminary objections in the nature of a demurrer, it is necessary for this [C]ourt to accept as true all well-pleaded facts and the reasonable inferences therefrom, and only sustain the demurrer if it is certain that no recovery is permitted.
 

 Humphreys v. Niagara Fire Insurance Co.,
 
 404 Pa.Super. 347, 353, 590 A.2d 1267, 1270 (1991),
 
 appeal denied,
 
 528 Pa. 637, 598 A.2d 994 (1991). We also observe the well-established principle that “the burden of establishing a valid policy claim falls upon the insured.”
 
 Riehl v. Travelers Insurance Co.,
 
 772 F.2d 19, 23 (3rd Cir.1985).
 

 In addressing the merits of appellant’s arguments in the instant case, we note that there are really two separate issues before this Court, which are: (1) whether there was a duty on the part of Rockwood to
 
 defend
 
 Antrim against the PEDF action under either the CGL or POL policies; and (2) if so, whether Rockwood had the further duty to
 
 indemnify
 
 Antrim for the damages it incurred in resolving the PEDF action under the terms of those same policies. Our decision on these issues will depend upon our interpretation of the insurance policies issued to Antrim by Rockwood.
 
 [1]
 
 As this Court stated in
 
 D’Auria v. Zurich Insurance Co.,
 
 352 Pa.Super. 231, 507 A.2d 857 (1986):
 

 The duty to defend is separate from and
 
 greater than
 
 the duty to indemnify, [citation omitted]. In purchasing insur
 
 *528
 
 anee, the appellant here purchased not only the insurer’s duty to indemnify when claims which fall within the policy’s coverage are successful, but also protection against those groundless, false or fraudulent claims regardless of the insurer’s ultimate liability to pay. [citation omitted].
 

 Id.
 
 at 233-34, 507 A.2d at 859 (emphasis added).
 

 In order to determine whether Antrim is or is not entitled to recover from PIGA for Rockwood’s failure to defend under the facts alleged in the instant claim, we must focus solely on the factual allegations appearing on the face of the complaint filed by PEDF against Antrim in the
 
 underlying action.
 

 Not all claims asserted against an insured, however, activate the insurer’s duty to defend.
 
 In analyzing whether the insurer has a duty to defend, we must first look to the [underlying] complaint filed against the insured,
 
 [citation omitted]. “It is not the actual details of the injury, but the
 
 nature of the claim
 
 which determines whether the insurer is required to defend.” [citations omitted].
 
 After discerning the facts alleged in the [underlying] complaint, we then must decide whether, if those facts were found to be true, the policy would provide coverage. If it would, then there is a duty to defend.
 

 If the factual allegations of the [underlying] complaint on its face state[ ] a claim to which the policy
 
 potentially
 
 applies, the insurer must defend, [citations omitted].
 

 Thus, the insurer owes a duty to defend if the [underlying] complaint against the insured alleges facts which would bring the claim within the policy’s coverage if they were true.
 
 It is the face of the [underlying] complaint and not the truth of the facts alleged therein which determines whether there is a duty to defend.
 

 Id.
 
 at 234-35, 507 A.2d at 859 (emphasis added).
 

 “In making this determination, the factual allegations of the [underlying] complaint are taken to be true and the [underly
 
 *529
 
 ing] complaint is to be liberally construed with all doubts as to whether the claims may fall within the coverage of the policy to be resolved in favor of the insured.”
 
 O’Brien Energy Systems, Inc. v. American Employers’ Insurance Co.,
 
 427 Pa.Super. 456, 462, 629 A.2d 957, 960 (1993),
 
 quoting Biborosch v. Transamerica Insurance Co.,
 
 412 Pa.Super. 505, 509, 603 A.2d 1050, 1052 (1992),
 
 appeal denied,
 
 532 Pa. 653, 615 A.2d 1310 (1992). “The duty to defend may exist even though ultimately there may be no duty to indemnify.”
 
 Heffernan & Co. v. Hartford Insurance Co.,
 
 418 Pa.Super. 326, 332, 614 A.2d 295, 298 (1992).
 

 Thus:
 

 [o]ur [initial] inquiry is whether, based upon the allegations in the ...
 
 federal complaint,
 
 there are any alleged facts, which, if proven to be true, could possibly bring the claim within the scope of the coverage of the [insurance] policies].
 

 Humphreys, supra
 
 404 Pa.Super. at 355, 590 A.2d at 1271 (emphasis added). Having taken all of the allegations made by PEDF in the underlying action against Antrim as true, we conclude, as did the trial court, that Rockwood had no duty to defend Antrim against the PEDF action because the facts alleged therein were not of the sort which could possibly bring the claim within the scope of coverage provided by either the CGL or the POL policies.
 

 The CGL Policy
 

 The CGL policy issued to Antrim by Rockwood was comprehensive in that it provided coverage for bodily injury and property damage which occurred during the policy period. In this regard, the “Insuring Agreement” of the CGL policy stated that:
 

 (a). We will pay those sums that the insured becomes legally obligated to pay as damages because of “bodily injury” or “property damage”
 
 to which this insurance applies.
 
 No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS — COVERAGES A AND B. This insurance applies only to “bodily
 
 *530
 
 injury” or “property damage” which occurs during the policy period. The “bodily injury” or “property damage” must be caused by an “occurrence.” The “occurrence” must take place in the “coverage territory.” We will have the right and duty to defend any “suit” seeking those damages.
 

 (Reproduced Record, p. 81a). (emphasis added).
 

 Importantly, however, the CGL policy also provided, under the heading “Exclusions,” that:
 

 This insurance does
 
 not
 
 apply to:
 

 sjc s¡{ s}{
 

 (f)(1) “Bodily injury” or “property damage” arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:
 

 (a)
 
 at or from premises you own, rent or occupy.
 

 Id.
 
 (emphasis added). In the policy, “pollutants” is defined as “any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalies, chemicals and waste” (Reproduced Record, p. 82a).
 

 Antrim contends that inasmuch as it did not “own, rent or occupy” the underground mine complex, from which the pollutants were actually released, the CGL pollution exclusion simply should not apply in this case. The essence of Antrim’s argument is that because Antrim merely owned the mining operation
 
 above
 
 the underground mine complex, rather than the underground mine complex itself, the fact that it conducted surface mining operations which allegedly worsened the acid mine drainage already flowing via gravity down through Antrim Deep Mine Tunnel Number One to the mouth of the underground mine complex should not be considered by us in deciding whether Rockwood was required to defend and/or indemnify Antrim against the PEDF suit. We decide that Antrim’s argument in this regard is without merit.
 

 In
 
 O’Brien Energy Systems v. American Employers’ Insurance Co., supra,
 
 this Court interpreted a provision identical to the one at issue herein and concluded that it was intended by both the insurer and insured to be an
 
 absolute
 
 pollution
 
 *531
 
 exclusion. Judge Wieand, writing for this Court, clearly and unequivocally stated that:
 

 [i]t must be said in this case, therefore, that the policy language in the several policies contains
 
 an unambiguous, all encompassing disclaimer of coverage for damages caused by a migration of polluting [substances]. See: Guilford Industries, Inc. v. Liberty Mutual Insurance Co.,
 
 688 F.Supp. 792, 794 (D.Me.1988),
 
 aff'd,
 
 879 F.2d 853 (1st Cir.1989);
 
 Alcolac Inc. v. California Union Ins. Co,
 
 716 F.Supp. 1546, 1549 (D.Md.1989);
 
 League of Minn. Cities Insurance Trust v. City of Coon Rapids,
 
 446 N.W.2d 419, 421-422 (Minn.Ct.App.1989).
 

 !¡i $ ‡ ‡ ‡
 

 The language of the several policies is clear.
 
 There is no coverage for claims which are based on the escape of pollutants, and this is so irrespective of the role which the insured is alleged to have played in the pollution.
 

 O’Brien, supra
 
 427 Pa.Super. at 466-68, 629 A.2d at 961-63 (emphasis added).
 

 Based on
 
 O’Brien,
 
 we hold that the CGL policy at issue in the instant case does not provide coverage for the type of claim advanced by PEDF against Antrim and therefore, Rock-wood had no duty to defend Antrim against that claim. Because there was no duty on the part of Rockwood to defend Antrim pursuant to the CGL policy, there could be no duty to indemnify it under the terms of that policy, either. Accordingly, the trial court did not err in granting PIGA’s preliminary objections in the nature of a demurrer as to the CGL policy because it is certain that no recovery by Antrim could be permitted under the facts and circumstances of this case.
 

 The POL Policy
 

 The POL policy issued by Rockwood to Antrim stated under the heading, “Insuring Agreement — Bodily Injury and Property Damage Liability,” that:
 

 (a). We will pay those sums that the insured becomes legally obligated to pay as compensatory damages because
 
 *532
 
 of “bodily injury” or “property damage”
 
 to which this insurance applies.
 
 We will have the right and duty to defend any “suit” seeking those damages.
 

 (b). This insurance applies only to “bodily injury” and “property damage” caused by a
 
 “pollution incident”
 
 that
 
 commences
 
 on or after the
 
 Retroactive Date
 
 [of January 1, 1987] shown in the Declarations. The “pollution incident” must be from an “insured site” or “waste facility” in the “coverage territory.”
 

 The insured’s responsibility to pay damages because of the “bodily injury” or “property damage” must be determined in a “suit” on the merits in the “coverage territory” or in a settlement we agree to.
 

 (Reproduced Record, p. 129a). (emphasis added). The following “Exclusions” were then noted in that same policy:
 

 This insurance does not apply to:
 

 (a) “Bodily injury” or “property damage” caused or contributed to by any
 
 “pollution incident
 
 ” that
 
 commences
 
 prior to the
 
 Retroactive Date
 
 [of January 1, 1987] shown in the Declarations.
 

 (b) “Bodily injury” or “property damage”
 
 expected or intended
 
 from the standpoint of the insured.
 

 (1) “Bodily injury” or “property damage” arising out of a
 
 “pollution incident”
 
 which results from or is directly or indirectly attributable to
 
 failure to comply with any applicable statute,
 
 regulation, ordinance, directive or order relating to the protection of the environment and promulgated by any governmental body, provided that failure to comply is a
 
 willful
 
 or deliberate act or
 
 omission of ... [t]he
 
 insured....
 

 (Reproduced Record, p. 129a-130a). (emphasis added).
 

 In its complaint against Antrim, PEDF alleged that although Antrim was aware of the fact that its surface mining business was discharging pollutants into the Babb’s Creek
 
 *533
 
 Watershed, it failed to obtain the proper permits pursuant to the FCWA and Pennsylvania’s CSL, and thus, any damages that it suffered in connection with the PEDF action were
 
 expected and intended
 
 in that they were the result of Antrim’s
 
 willful failure
 
 to comply with the relevant statutes. In support of this allegation, PEDF pointed to the fact that Antrim had submitted background monitoring reports to the Department of Environmental Resources (in connection with other permits it held) since at least 1983 acknowledging that discharges from its surface mining operations to the underground mine complex were greater with regard to both iron and manganese than those permitted under state or federal law (Reproduced Record, p. 24a). Taking this allegation as true, we conclude that under the terms of this policy, Rock-wood was not required to defend or indemnify Antrim in the PEDF action, and thus, PIGA is not liable to Antrim for the damages it suffered in connection therewith.
 

 Furthermore, even if the failure on the part of Antrim to comply with the FCWA and the CSL was other than deliberate, and the damages flowing therefrom were other than expected, we would nevertheless conclude that the POL policy does not apply to the facts of this case because the “pollution incident” here in question began well before the retroactive effective date of that policy.
 
 [2]
 
 According to the allegations in the PEDF complaint, which we must take as true, the pollution incident for which Antrim is being sued
 
 *534
 

 commenced
 
 prior to 1984. The retroactive effective date of the POL policy was January 1, 1987. Therefore, on this basis also, Antrim is not entitled to coverage under the POL policy issued to it by Rockwood.
 
 [3]
 

 “It is not the actual details of the injury, but the nature of the claim which determines whether the insurer is required to defend.”
 
 O’Brien, supra
 
 at 462, 629 A.2d at 960. “Once an insurer looks to the facts alleged in the complaint and determines that if those facts were found to be true, coverage would not apply, then the insurer properly may refuse to provide a defense.”
 
 Humphreys, supra
 
 404 Pa.Super. at 356, 590 A.2d at 1272. In the instant case, the nature of the claim by PEDF was simply not one that Rockwood was required to defend, and therefore, PIGA is not liable to Antrim for any damages that it incurred in connection with the PEDF action. Because there was no duty to defend, there could be no duty to indemnify, and we therefore conclude that the trial court did not err in granting PIGA’s preliminary objections in the nature of a demurrer as to both the CGL or POL policies.
 

 Order affirmed.
 

 [1]
 

 . We note that:
 

 The interpretation of an insurance contract is a matter of law for the court. The primary objective of contract interpretation is to ascertain and effectuate the intent of the parties as it is reasonably manifested by the language of their written contract.
 
 The words of an insurance policy which are unambiguous should be construed according to their plain and ordinary meaning.
 
 The court must assess the writing as a whole, and not in discrete units, when determining whether a writing is ambiguously drafted. A contract term or provision may properly be deemed ambiguous if reasonable minds can differ as to its meaning. While the court will not allow an overly-subtle or technical interpretation to defeat the reasonable expectations of the insured,
 
 it will not convolute the plain meaning of a writing merely to find an ambiguity,
 
 [citations omitted],
 

 O’Brien v. Energy Systems, Inc. v. American Employers’ Insurance Co.,
 
 427 Pa.Super. 456, 461-62, 629 A.2d 957, 960 (1993) (emphasis added).
 

 [2]
 

 . In this regard, the POL policy provides that:
 

 "Pollution incident” means emission, discharge, release, or escape of pollutants into or upon land, the atmosphere, or
 
 any
 
 watercourse or body of water, provided that such emission, discharge, release or escape results in "environmental damage.” The entirety of any such emission, discharge, release, or escape shall be deemed to be
 
 one
 
 “pollution incident.”
 

 (Reproduced Record, p. 134a). (emphasis added).
 

 From the above-noted definition, it appears that the "pollution incident” referred to in the POL policy is analogous to and synonymous with an "occurrence" as it is referenced in
 
 D’Auria v. Zurich Insurance Co., supra.
 
 Here, much like the situation in
 
 D’Auria,
 
 the "pollution incident” antedated the relevant policy period because the effects of the injury manifested themselves prior to January 1, 1987; therefore, Rockwood was under no duty to defend Antrim against the PEDF action pursuant to the POL policy.
 

 [3]
 

 . Further, although Antrim argues that our interpretation and application of this exclusion would effectively preclude the possibility of coverage for
 
 any
 
 pollution incident whatsoever under the POL policy, we would remind Antrim that our scope of review is limited only to the specific question of whether the acid mine drainage which was discharged by it in 1983 via Antrim Deep Mine Tunnel Number One into the underground mine complex can be considered property damage to which the Rockwood POL policy is applicable. As discussed above, we conclude that it cannot.