J-A17045-16

2018 PA Super 68

| CONSOLIDATED RAIL CORPORATION | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| ACE PROPERTY & CASUALTY INSURANCE CO. (FORMERLY AETNA INS. CO.), ALLIANZ GLOBAL RISKS U.S. INSURANCE CO. (FORMERLY ALLIANZ INS. CO.), ALLIANZ UNDERWRITERS INSURANCE CO., ALLSTATE INSURANCE CO. (AS SUCCESSOR IN INTEREST TO NORTHBROOK EXCESS & SURPLUS INS. CO. A/K/A NORTHBROOK INS. CO.), AMERICAN HOME ASSURANCE CO. (AMERICAN INTERNATIONAL GROUP), AMERICAN MOTORISTS INSURANCE CO. (KEMPER), AVIVA INSURANCE CO. OF CANADA (U.S. BRANCH), (FORMERLY GAN GENERAL INS. CO. (FORMERLY SIMCOE & ERIE GENERAL INS. CO.)), BIRMINGHAM FIRE INSURANCE CO. OF PA. (AMERICAN INTERNATIONAL GROUP), BRITAMCO UNDERWRITERS, INC. C/O DEVONSHIRE GROUP, CENTURY INDEMNITY CO. (SUCCESSOR IN INTEREST TO CIGNA SPECIALTY INS. CO. (FORMERLY CALIFORNIA UNION INSURANCE CO.) AND AS SUCCESSOR TO CCI INSURANCE CO., SUCCESSOR TO INSURANCE CO. OF NORTH AMERICA), CONTINENTAL INSURANCE CO. (IN ITS OWN RIGHT AND AS SUCCESSOR IN INTEREST TO HARBOR INSURANCE CO.) (CNA INSURANCE COS.), EMPLOYERS MUTUAL CASUALTY CO. (EMC INSURANCE COS.), EMPLOYERS INSURANCE OF WAUSAU (FORMERLY EMPLOYERS MUTUAL OF WAUSAU), EVANSTON INSURANCE CO., | |

EVEREST REINSURANCE CO. (FORMERLY PRUDENTIAL REINSURANCE CO.), FEDERAL INSURANCE CO. (CHUBB GROUP OF INS. COS.), FIREMAN'S FUND INSURANCE CO., FIRST STATE INSURANCE CO. (HARTFORD INSURANCE GROUP), GRANITE STATE INSURANCE CO. (AMERICAN INTERNATIONAL GROUP), HARTFORD ACCIDENT & INDEMNITY CO. (HARTFORD INSURANCE GROUP), HUDSON INSURANCE CO., INSCO C/O DEVONSHIRE GROUP, INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA (AMERICAN INTERNATIONAL GROUP), LANDMARK INSURANCE CO. (AMERICAN INTERNATIONAL GROUP), LEXINGTON INSURANCE CO. (AMERICAN INTERNATIONAL GROUP), LIBERTY MUTUAL INSURANCE CO., MIDSTATES REINSURANCE CORP. (FORMERY MEAD REINSURANCE CORP.), NATIONAL CASUALTY CO., NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA (AMERICAN INTERNATIONAL GROUP), NORTHWESTERN NATIONAL INSURANCE CO. (FORMERLY BELLEFONTE UNDERWRITERS INSURANCE CO.), OLD REPUBLIC INSURANCE CO., PACIFIC INSURANCE CO. (CNA INSURANCE COS.), REPUBLIC INSURANCE CO., ROYAL INSURANCE CO. OF AMERICA (FORMERLY ROYAL GLOBE INS. CO.) (ROYAL & SUN ALLIANCE INSURANCE GROUP), SENTRY INSURANCE GROUP (AS ASSUMPTIVE REINSURER OF GREAT SOUTHWEST FIRE INS. CO. AND GREAT SOUTHWEST SURPLUS LINES INS. CO.), ST. PAUL FIRE & MARINE INSURANCE CO. (ST. PAUL TRAVELERS COMPANIES), ST PAUL SURPLUS LINES INSURANCE CO. (ST. PAUL TRAVELERS COMPANIES), STONEWALL INSURANCE

CO., TIG INSURANCE CO. (AS
SUCCESSOR TO INTERNATIONAL INS.
CO. (FORMERLY INTERNATIONAL
SURPLUS LINES INS. CO.)) (FAIRFAX
FINANCIAL (USA) GROUP), TIG PREMIER
INSURANCE CO. (FORMERLY
TRANSAMERICA INS. CO.) (FAIRFAX
FINANCIAL (USA) GROUP), TRAVELERS
CASUALTY AND SURETY CO. (FORMERLY
ATENA CASUALTY AND SURETY CO.)
(ST. PAUL TRAVELERS COMPANIES),
TRAVELERS INDEMNITY CO.(ST. PAUL
TRAVELERS COMPANIES), TWIN CITY
FIRE INSURANCE CO. (HARTFORD
INSURANCE GROUP), UNIONE ITALIANA
REINSURANCE CO. OF AMERICA, INC.,
UTICA MUTUAL INSURANCE CO.,
ZURICH AMERICAN INSURANCE CO.
(FORMERLY ZURICH INSURANCE CO.)
AND CERTAIN LONDON MARKET
INSURANCE COMPANIES AND
PENNSYLVANIA PROPERTY & CASUALTY
INSURANCE GUARANTY ASSOCIATION
(FORMERLY PENNSYLVANIA INSURANCE
GUARANTY ASSOCIATION)

        Appellees        No. 1376 EDA 2015

Appeal from the Judgment Entered April 8, 2015
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 002638 Civil Action Sept. Term, 2004

BEFORE:  GANTMAN, P.J., LAZARUS, J., and PLATT, J.*

OPINION BY GANTMAN, P.J.:        **FILED MARCH 23, 2018**

Appellant, Consolidated Rail Corporation ("Conrail"), appeals from the

summary judgment entered in the Philadelphia County Court of Common

---

* Retired Senior Judge assigned to the Superior Court.

- 3 -

Pleas, in favor of Stonewall Insurance Company ("Stonewall"), Continental Insurance Company ("Continental"), and Lloyd Italico & L'Ancora ("Lloyd"). For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

This case involves Conrail's efforts to obtain indemnification for contamination remediation, clean-up costs, and other expenses related to toxic spills and releases at various geographic sites. The trial court set forth the relevant facts regarding the Elkhart site as follows:

> From 1976 through 1999, Conrail owned a large classification yard for freight cars in Indiana. Beginning in 1986, the [United States Environmental Protection Agency ("EPA")] found significant amounts of [trichloroethene ("TCE")] and [carbon tetrachloride ("CCl$_4$")] in portions of Conrail's property and in the groundwater under a large number of neighboring properties.

> Conrail admits that [t]here is only one incident that resulted in carbon tetrachloride contamination at Elkhart—a release of [CCl$_4$] in the vicinity of track number 69…in May 1968[,] while Penn Central was operating Elkhart…eight years before Conrail began its own operations at Elkhart.

> Conrail also claims that [t]he principal source of the TCE contamination at Elkhart was a release of TCE in the Track 65-66 area of the rail yard. The TCE emanating from the rail yard has reached the drag strip and the St. Joseph River on the northern border of the site. The EPA's expert, Gary Chirlin, opined that [s]ubstantial TCE contamination exists over the entire aquifer thickness…within this source area; this is consistent with a local release of sufficient magnitude that separate phase TCE [a dense non-aqueous phase liquid ("DNAPL")] penetrated nearly to bedrock. Conrail's lead environmental consultant at the Elkhart [s]ite, Miranda Menzies, testified that the nature of the contamination at Tracks 65-66—*i.e.,* a large release of contaminants in undissolved form that sank through the soil into the

aquifer—is consistent with a large spill from a tank car, as opposed to multiple small spills [which] would remain close to the soil surface. While the exact date of this release [of TCE] is unknown, it likely took place before 1976.

In addition, Conrail notes that its employees told the EPA that solvents were used as degreasers at the car shop, then poured onto concrete pads and hosed down; they did not specify the year(s) in which this occurred or the types of solvent(s) used.

Through September 2012, Conrail incurred over $15 million in remediation costs, approximately $3.8 million in government payments, and more than $2 million in defense costs in connection with the Elkhart [s]ite. Remediation is ongoing and Conrail continues to incur additional costs with respect to the Elkhart [s]ite.

(Trial Court Opinion, filed October 28, 2014, at 1-2) (internal quotation marks and footnotes omitted). The trial court set forth the relevant facts regarding the Hollidaysburg, Douglasville, Conway, Beacon, and Paoli sites as follows:

The Hollidaysburg, Pennsylvania, [s]ite was owned by Conrail from 1976 until 1999. It was a car shop, which was used to build, rebuild, and repair railway cars, and a reclamation plant, which was used to repair railcars and components, to recover parts and equipment from railcars, and to recycle rail equipment and materials that could no longer be used.

In 1997, the [Pennsylvania Department of Environmental Protection ("PaDEP")] and Conrail discovered over 3,500 drums of waste material buried on the [s]ite. It appears that Conrail's predecessors buried the drums. In addition, there was apparently spilling and/or leaking of hazardous waste from [Conrail's] drum crusher and its catch basin onto the adjacent ground.

[Polychlorinated biphenyl ("PCB")] and lead contamination was found in the soil at the Hollidaysburg [s]ite, but not at any neighboring sites. Arsenic contamination was also a problem at the site. In addition, [n]aphthalene and various

metals were present at levels exceeding established maximum allowable levels in the groundwater at the [s]ite, but Conrail's environmental consultants concluded that the contaminated groundwater was not migrating off-site.

The PaDEP ordered Conrail to excavate and remove the drums. Conrail was also ordered to install a control system to prevent off-site migration of surface water, submit a plan to control wind dispersion of contamination, and submit a groundwater monitoring plan to determine whether any contaminated groundwater was migrating off-site. Conrail promptly undertook the remediation required by [the PaDEP's] Administrative Order, which included the performance of groundwater flow and usage studies; the testing and monitoring of groundwater; the performance of an ecological assessment of the Beaverdam and Frankstown branches of the Juniata River; and the investigation of potential contamination at other locations at the [s]ite.

In connection with the Hollidaysburg [s]ite, Conrail paid $4,999,806.60 in remediation costs and $2,828,740.45 in defense costs which it seeks to recover [through indemnification]. It also paid $4.1 million in governmental fines and penalties for which it seeks coverage.

\*　　\*　　\*

The Douglasville Disposal [s]ite is located in Pennsylvania. It was never owned or operated by Conrail. It was operated by Berks Associates as a waste oil recycling plant. Between 1976 when Conrail came into being and 1985 when waste oil processing ceased at the Douglassville [s]ite, Conrail sent its waste oil to be processed there, as did many other entities. At least one Conrail agent testified to the effect that Conrail contracted with Berks Associates to safely process and recycle its waste oil, and to do so in compliance with all applicable environmental regulations.

In the 1980s, the EPA investigated the [s]ite and discovered a panoply of contaminants, including [volatile organic compounds ("VOCs")], PCBs, [polycyclic aromatic hydrocarbons ("PAHs")], and lead in the soil, ground and surface water, which had emanated from [ten] different source areas of contamination at the [s]ite. The

contamination was the result of Berks Associates' waste storage and disposal methods, including disposing of it in lagoons, landfarming it, and depositing filter cakes, as well as leaks and spills resulting from Berks' recycling operations. There were also serious risks [of further contamination] arising from Berks' abandoned processing facility.

Litigation and remediation took place over the next [ten] or more years. In 2001, Conrail and other potentially responsible parties entered into agreements regarding payment of their respective shares of the remediation costs. Conrail claims it paid $5,983,997.95 in such costs and incurred $1,313,053.02 in defense costs for both of which it seeks [indemnification]. Additional costs may yet be incurred by Conrail.

\* \* \*

The Conway rail yard is located in western Pennsylvania. A creek, Crows Run, flows through a stone and concrete culvert under the rail yard. Upon exiting the culvert, Crows Run flows approximately 200 feet before joining the Ohio River. Thirty-eight storm water outfalls and drains intersect the rail yard and discharge into the Ohio River or into Crows Run along the culvert wall. Conrail operated Conway from 1976 until 1999.

[C]ertain areas at the Conway rail yard were contaminated with oil [as a result of releases occurring] both before and after April 1, 1976, [when Conrail assumed control of the site. The oil] leached and migrated through the soil and was able to enter Crows Run by way of the Conway drainage system, as well as from groundwater seepage through the culvert side wall.

Two documented oil releases occurred at Conway while Conrail was operating there. The first occurred on or around September 29, 1977, and resulted from a spill that made its way into the Ohio River through a sewer outfall. The release of oil appears to have continued unabated until approximately October 7, 1977. Although Conrail was never able to confirm the source of the spill, it was suspected that the discharge was caused when part of the wastewater

treatment facility was temporarily shut down by a contractor hired to clean out sewer lines at the rail yard.

The second spill occurred in December 1979[,] when an underground fueling pipe separated at a joint, causing the release of oil directly into the ground (as opposed to directly into Crows Run) near a building in the vicinity of Crows Run. Approximately 25,000 gallons of oil [were] recovered from Crows Run during and immediately after the spill; the quantity of oil that was released from the pipeline but stayed in the ground and was not [immediately] released to Crows Run or the river is unknown. Although the spill was originally thought to have occurred because of a ruptured pipeline, the actual source of the spill was identified on December 31, 1979[,] as a separated pipeline and was repaired by January 2, 1980. Booms and other recovery efforts were implemented to remove oil from Crows Run.

There were also two, non-oil, chemical spills at Conway, one of styrene monomer in 1984[,] and one of carbon disulfide in 1985.

Conrail admits that it knew about the existing oil contamination when it assumed control of Conway, but denies that it knew until the 1990s that it would be liable for millions of dollars in remediation costs with respect to the [s]ite. Conrail seeks coverage relating to the remediation of diesel fuel and lubricant oil, as well as styrene and carbon disulfide, from the ground and subsurface of the rail yard, as well as from the groundwater, Crows Run, and the Ohio River.

Through December 2012, Conrail has incurred over $14 million in remediation costs, almost $1.2 million in government payments to the Commonwealth of Pennsylvania and the Borough of Conway, and more than $2 million in defense costs. Conrail continues to incur additional remediation costs.

\* \* \*

The Beacon Park rail yard is located in Massachusetts and was operated by Conrail from 1976 through 1999. The rail yard is bisected by the Massachusetts Turnpike, so that it

comprises two distinct units. Portions of both units are contaminated with [light non-aqueous phase liquids ("LNAPLs")], primarily oil and diesel fuel.

[T]he first area of contamination at the Beacon Park [s]ite is known as the "Charles River Chamber" area and is located near the diesel servicing facility in the loop track area. The Charles River Chamber is a collection point for several storm sewers. LNAPL in the surrounding groundwater entered the chamber through cracks and fissures in the sewer system, often as the result of heavy rains. The sources of this contamination are the various historical releases at the Beacon Park [s]ite as well as the diesel servicing area and the lube oil tank area west of the chamber, all of which migrated to the area surrounding the chamber.

The second area of contamination is located in the classification yard section of Beacon Park and is known as the "Control Tower" area. Contamination at the Control Tower area consists of a layer of LNAPL on the water table beneath the Turnpike and the northern portion of the rail yard. When precipitation increased the height of the water table, the oil would infiltrate a storm drain running through this area and flow into the Charles River.

Conrail knew, at the time that it took over operations of the Beacon Park rail yard, that there was contamination [there], and that an EPA Administrative Order had been issued regarding contamination at Beacon Park on March 1, 1976…. Conrail [also] knew, in August 1976, that it would be responsible for complying with an order issued by the Massachusetts Division of Water Pollution Control. Once Conrail completed the work required by these two orders, however, [Conrail claims] it had no reason to believe that it would be responsible for further remediation of the [s]ite. Conrail denies that it was aware in 1976, or at any other time during the period when [its insurers] issued policies, [that subsequent] remediation would approach the level of coverage provided by [its insurers' p]olicies.

There is evidence that at least two spills occurred [in the Charles River Chamber area after Conrail assumed operations of the rail yard]: a spill of approximately 2,000 gallons of fuel reported to Conrail on November 1, 1981,

and a spill of approximately 800 gallons on or about August 9, 1982.

With respect to the 1981 leak, the EPA determined that oil discharg[ing] from Conrail's corroded underground [two inch] pipe [entered] into surrounding earth, leached through the ground and groundwater into a storm conduit, flowed through the conduit to a junction box, and spilled through two culverts from the junction box to the Charles River. [C]ontamination from the pipe leak reached the Charles River Chamber area of Beacon Park. The leak occurred for [eight] days until Conrail located its source and capped the pipe.

[N]o identifiable release or source of the contamination in the Control Tower area of the yard was ever identified.

Conrail seeks coverage here for $5,388,264.76 in remediation costs and $352,101.49 in defense costs. Conrail dropped its claim for approximately $2.5 million in government penalties that it paid.

*   *   *

The Paoli [s]ite was a rail yard and car shop that Conrail operated in Pennsylvania from 1976 through 1982, and which was operated by [the Southeastern Pennsylvania Transportation Authority ("SEPTA")] thereafter. [F]rom the early 1950s, railcars using transformer oil that contained PCBs were repaired and maintained at the Paoli rail yard…. [F]or most of the period before April 1, 1976, the hazards of PCBs were unknown and…from an environmental standpoint the PCB-containing transformer fluid was treated similarly to other oils. … [R]eleases of PCB-containing fluid onto the ground occurred during Conrail's and SEPTA's occupancy at the site, including some releases during maintenance operations.

[A]fter [Conrail] assumed operations at Paoli, federal and state regulations began to require that PCBs be treated as hazardous substances and Conrail's own internal policies began to require that PCBs be treated as a hazardous substance soon thereafter. [As a result,] there was a significant decrease in the incidence of PCB discharges

- 10 -

during the operations conducted by Conrail and…known spills were commonly cleaned up promptly.

However, on at least [twenty] different occasions between 1979 and 1985, PCBs spilled from railcars at the Paoli [s]ite. Conrail admits that the [railcar] transformers were designed to release PCB-containing fluid in the event of excessive pressure, but Conrail denies that th[is] "burping" of the transformers was routine or that it was the exclusive source of PCB releases into the ground at Paoli. Conrail [also] admits that leaks occurred from time to time from faulty gaskets or eroded and fractured sight glass on some cars, but denies that such leaks occurred frequently.

Conrail seeks $12,766,859.05 in indemnity costs and $5,215,407.74 in defense costs…. Some of those costs were incurred by SEPTA, which Conrail claims is an additional insured under the [p]olicies.

(Trial Court Opinion, filed October 28, 2014, at 1-11) (footnotes and some internal quotation marks omitted). The trial court set forth the relevant facts regarding the Lloyd principal-agent relationship as follows:

[Conrail] claims that [Lloyd] issued a $1,000,000 Umbrella Excess Liability [p]olicy to Conrail for the April 1, 1978 through April 1, 1979 policy period. [Lloyd] denies that it issued any such policy to Conrail. Due to the passage of time ([thirty-six] years), many relevant records have been lost or destroyed, memories have dimmed, and witnesses can no longer be found, so the court must determine which party must bear the consequences of this lack of evidence.

\* \* \*

In support of its claim that [Lloyd] issued an insurance contract to Conrail, Conrail proffers a single page that purports to be an "Umbrella Excess Liability Policy Issued By [Lloyd]" (the "[Lloyd p]olicy"). It is signed by "Joseph F. Ambriano" on behalf of "PLAR GROUP." There is also a second page that purports to be "Endorsement No. 1" to the

- 11 -

[Lloyd p]olicy, which increases the coverage provided by the [p]olicy from $500,000 to $1,000,000. That Endorsement is signed by "R.A. Browing" on behalf of the "Independence Marine Group." A third page purports to be "Endorsement No. 2" to the [p]olicy. It sets forth a computation of the earned premium based on Conrail's revenues during the [p]olicy year, which results in an additional premium payment due. Endorsement No. 2 was issued in July 1979, after the [p]olicy period ended, and is signed "Richard H. Byron for Plar."

Through discovery, Conrail has established that, at the time this transaction allegedly occurred, the following relationships existed:

1. Conrail's broker was Marsh & McLennan ("Marsh") in New York, New York.
2. Marsh worked with a sub-broker East West International ("EWI") in Geneva, Switzerland.
3. EWI negotiated with Mr. Ambriano of Davis, Dorland & Co. ("Davis Dorland") in New York, New York.
4. Mr. Ambriano and George B. McNeill International had some authority to act on behalf of the Pool Latino Americano de Reaseguros ("PLAR") in Panama.
5. [Lloyd] was a member of PLAR. In [February 1977], [Lloyd] expressly authorized PLAR's Administrator, Estudio Consultivo De Seguros S.A. "to accept shares in Reinsurance transactions" on behalf of [Lloyd] up to a limit of $10,000.

\*     \*     \*

Conrail has not been able to discover any document giving PLAR or Mr. Ambriano express authority to bind [Lloyd] with respect to the issuance of excess policies in the amount of [$500,000] such as the one at issue here. Instead, the evidence shows only that PLAR's and thereby Mr. Ambriano's, express authority to act on behalf of [Lloyd] was limited to reinsurance policies up to $10,000.

Conrail [also] obtained an affidavit from Mr. Ambriano, who stated as follows with respect to the [Lloyd p]olicy:

- 12 -

> I do not recognize the policy number or the form of such number. I have no recollection of signing this document. However, the signature that appears on [it] is a photocopy of my signature.
>
> Although I have no specific recollection of signing [it] or the 1978 transaction to which it refers approximately [thirty-six] years ago, I recall that [Lloyd] was a member of PLAR and I wrote business on behalf of PLAR. I understood I was authorized to sign [it] in May 1978. I would not have signed [it] if I did not believe I was authorized by PLAR to sign it on behalf of [Lloyd].

\* \* \*

(Trial Court Opinion, filed December 30, 2014, at 1-4) (footnotes omitted).

Procedurally, Conrail initiated this action in 2004 against fifty-five insurers; since then, only Stonewall, Continental, and Lloyd remain in the case as Appellees in this appeal. On October 6, 2010, Lloyd filed preliminary objections to Conrail's complaint, and on April 29, 2011, Lloyd filed a memorandum of law in support of its preliminary objections, claiming it did not authorize the insurance policy to Conrail. Following briefing and oral argument, the trial court sustained Lloyd's preliminary objections and dismissed Conrail's complaint against Lloyd on February 21, 2012. On February 6, 2013, the court reconsidered its previous ruling on Lloyd's preliminary objections and overruled them. On March 25, 2013, Stonewall and Continental filed motions for summary judgment, and Conrail filed cross-motions for summary judgment. The court issued an opinion, on November 13, 2013, interpreting the "Operations Clause" of Stonewall's and

Continental's insurance policy. The court determined that the insurance policy required the insurers to reimburse Conrail only for the damages arising out of an "occurrence" (*i.e.*, environmental contamination) that was caused by or grew out of Conrail's operations at the sites. In other words, the policies provided coverage to Conrail only if Conrail could prove **it** had discharged some of the pollutants during the policy terms for which it had incurred liability. Lloyd filed a motion for summary judgment on June 16, 2014, arguing it did not authorize the policy Conrail proffered against Lloyd.

On October 28, 2014, the court applied its ruling of the "Operations Clause" to the sites and granted Continental's motion for summary judgment in part and denied it in part. The court determined facts for some of the sites indicated that pollutants had been discharged before Conrail took over operations. On that same day, the court granted summary judgment in favor of Stonewall because the court found pollutants had been discharged before Conrail began to operate at the site Stonewall insured. On December 30, 2014, the court granted summary judgment in favor of Lloyd, finding Lloyd did not authorize Conrail's policy. The court dismissed as moot Lloyd's remaining motions for summary judgment and Conrail's cross motion for summary judgment. Conrail and Continental filed a stipulation for entry of final judgment on April 6, 2015. On April 8, 2015, the court entered an order discontinuing without prejudice Conrail's claims regarding the twenty-seven non-focus sites listed in Conrail's complaint and entering final judgment in

favor of the Insurers and against Conrail as to all remaining claims and parties. Conrail timely filed a notice of appeal on April 23, 2015. The court, on April 28, 2015, ordered Conrail to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and Conrail timely complied on May 22, 2015.

Conrail raises three issues for our review:

> WHETHER LIABILITY INSURANCE POLICIES UNAMBIGUOUSLY PRECLUDE COVERAGE FOR CONRAIL'S POLLUTION-RELATED LIABILITIES UNLESS CONRAIL CAN PROVE ITSELF GUILTY OF DISCHARGING SOME OF THE POLLUTANTS…[?]
>
> WHETHER (I) CONRAIL HAD THE BURDEN TO PROVE THAT IT POLLUTED THIRD-PARTY PROPERTY TO ESCAPE APPLICATION OF THE INSURANCE POLICIES' OWN PROPERTY EXCLUSION TO ITS ENVIRONMENTAL LIABILITY AT THE HOLLIDAYSBURG SITE, AND (II) CONRAIL FAILED TO SATISFY THIS BURDEN DESPITE EVIDENCE THAT IT HAD CONTAMINATED GROUNDWATER UNDER THE SITE AND WAS LIABLE FOR ON-SITE REMEDIATION DESIGNED TO PREVENT THREATENED OFF-SITE DAMAGE[?]
>
> WHETHER CONRAIL FAILED AS A MATTER OF LAW TO PROVE THE EXISTENCE OF AN INSURANCE POLICY ALLEGEDLY ISSUED BY THE ITALIAN INSURER [LLOYD], DESPITE EVIDENCE FROM WHICH A JURY COULD FIND (I) THAT THE AGENT WHO SIGNED THE POLICY HAD ACTUAL OR APPARENT AUTHORITY TO ACT FOR [LLOYD], OR (II) THAT [LLOYD] SHOULD BE ESTOPPED FROM DENYING THE AGENT'S AUTHORITY[?]

(Conrail's Brief at 3-4) (footnote omitted).

Conrail argues the insurance policy language is ambiguous and can be reasonably read to provide coverage for Conrail's liability for preexisting contamination, regardless of whether Conrail actively contributed to that

contamination. As a result, Conrail contends the policy language should be construed against the drafter to effect the dominant purpose of the policy, which is to provide indemnity to Conrail. Specifically, Conrail offers three interpretations of the policy language to provide liability coverage. First, Conrail disagrees with the court's definition of an "occurrence" because it ignores the phrase "all operations incidental thereto," which is not specifically defined in the policy but is ordinarily defined by standard dictionaries as "related to." Had the trial court given effect to the phrase "all operations incidental thereto," Conrail suggests the court could have reasonably interpreted the policy to cover "occurrences" as related to Conrail's operations, because Conrail is engaged in the same operations as the previous site operators, conducted operations on the same properties, and used many of the same equipment and personnel in those operations.

Second, Conrail maintains the trial court should have considered the term "occurrence" under the more expansive policy language of "continuous or repeated exposure to conditions which cause injury or damage during the term of the policy." If the trial court had considered the term "occurrence" as a continuous and repeated exposure caused by the initial discharge event, Conrail posits the court could have concluded that the migration of previously discharged contaminants into and through the groundwater and off the site was covered by the policy. Conrail submits the policy should cover the continuous and repeated exposure occurring as a result of the initial event;

otherwise, the language "caused by or grew out of" is superfluous. Relying on a Kansas federal court case, Conrail claims the phrase "grew out of" should mean "associated with." Based on Conrail's interpretations of these applicable terms and phrases, Conrail reasons the preexisting contamination that evolved and expanded by migration on and off the site are "occurrences" which continued to happen during Conrail's operations; and the policy language lends itself to this construction to provide coverage for Conrail's liability.

Third, Conrail avers the language, "caused by or growing out of the insured's operations," when read in the context of the policy as a whole, could reasonably be interpreted to permit broader coverage than just for a single event because the phrase "caused by or grew out of" modifies both "occurrence" and the larger promise of the policy to provide indemnification for the insured's liability. Under this broader interpretation, Conrail suggests liability can arise not only out of a triggering event but also the triggering event can stretch into a continued or repeated exposure to migrating contaminants. Because Conrail is liable for the preexisting contamination at the sites, under this broader policy interpretation, Conrail insists it should be covered by the relevant policies.

For its second issue, Conrail argues Continental should indemnify Conrail for the Hollidaysburg site remediation because the contaminated groundwater found at the site constitutes damage to third-party property. Conrail reasons

groundwater belongs to the Commonwealth under Pennsylvania law, not just to Conrail, so the contaminated groundwater is not Conrail's "owned property" within the meaning of the "Own Property Exclusion," thus liability coverage under the policy is available. Conrail alternatively posits the trial court incorrectly placed the burden of proving the "Own Property Exclusion" on Conrail where Pennsylvania law requires the insurer to prove policy exclusions. Conrail further complains the trial court improperly required Conrail to show that actual damage to third-party property occurred, where Pennsylvania courts have held "own property" exclusions do not bar coverage for remediation efforts to prevent threatened damage to third-party property. Conrail emphasizes that it engaged in remediation efforts by removing the buried drums at the Hollidaysburg site to prevent further contamination of any groundwater and surface waters, which Conrail maintains is property of the Commonwealth as a third party.

For Conrail's third and final issue, it argues a genuine issue of material fact exists in this case to preclude summary judgment. Specifically, Conrail claims Mr. Joseph Ambriano ("Mr. Ambriano") had authority to bind Lloyd to the terms of the Lloyd policy because Mr. Ambriano underwrote the policy through an implied principal-agent relationship based on the following facts: (a) Mr. Ambriano signed a statement indicating that he understood he was authorized to sign the Lloyd policy in May 1978 and that he would not have signed it if he did not believe he was so authorized; (b) an employee of EWI

documented a conversation he had with Mr. Ambriano, wherein Mr. Ambriano notified EWI that a recent change in government regulations restricted Lloyd's ability to issue a letter of credit for another Italian insurer and Mr. Ambriano suggested deferring the transfer; (c) PLAR, an international reinsurance syndicate, entered into an agreement with Mr. Ambriano through which he was deemed the sole and exclusive agent for all of PLAR's United States business; Lloyd was a PLAR member; and the majority of the policies issued by PLAR that are still of-record were direct policies rather than reinsurance policies; (d) PLAR negotiated policies for individual members, two of which were issued by another PLAR member to Conrail; and (e) Mr. Ambriano was highly regarded in the international insurance market. Based on these facts, Conrail also argues Mr. Ambriano bound Lloyd to the policy because he possessed apparent authority through a "limited delegation" from Lloyd to underwrite it. Conrail emphasizes Lloyd was a member of PLAR, and by nature of that membership, Lloyd delegated authority to PLAR to issue insurance policies on its behalf; and Mr. Ambriano frequently acted for PLAR. Conrail further contends that from the perspective of a third party engaging with Mr. Ambriano, it was reasonable for a broker to believe Mr. Ambriano possessed the authority to act on behalf of Lloyd because of his prominence in the market. Alternatively, Conrail avers Lloyd is estopped from arguing that a principal-agent relationship does not exist because once Lloyd was made aware of the policy, Lloyd failed to take reasonable steps to notify Conrail that

Mr. Ambriano was unauthorized to underwrite it. Conrail concludes the trial court erred as a matter of law in misinterpreting the policy clauses and exclusions at issue and misapplying Pennsylvania agency law, and this Court must reverse summary judgment and remand for further proceedings. For the following reasons, we disagree in part and agree in part.

Our standard of review of an order granting summary judgment requires us to determine whether the trial court abused its discretion or committed an error of law. *Mee v. Safeco Ins. Co. of America*, 908 A.2d 344, 347 (Pa.Super. 2006).

> Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason. Similarly, the trial court abuses its discretion if it does not follow legal procedure.

*Miller v. Sacred Heart Hospital*, 753 A.2d 829, 832 (Pa.Super. 2000) (internal citations and quotation marks omitted). Our scope of review is plenary. *Pappas v. Asbel*, 564 Pa. 407, 418, 768 A.2d 1089, 1095 (2001), *cert. denied*, 536 U.S. 938, 122 S.Ct. 2618, 153 L.Ed.2d 802 (2002). In reviewing a trial court's grant of summary judgment,

> [W]e apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of

law will summary judgment be entered. All doubts as to the existence of a genuine issue of a material fact must be resolved against the moving party.

Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of [a] cause of action. Summary judgment is proper if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will **bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action** or defense which in a jury trial would require the issues to be submitted to a jury. In other words, whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense, which could be established by additional discovery or expert report and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. Thus, a record that supports summary judgment either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense.

Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions.

*Chenot v. A.P. Green Services, Inc.*, 895 A.2d 55, 61 (Pa.Super. 2006) (internal citations and quotation marks omitted) (emphasis added).

"The interpretation of an insurance contract is a matter of law and is generally performed by a court." *Kropa v. Gateway Ford*, 974 A.2d 502, 505 (Pa.Super. 2009), *appeal denied*, 605 Pa. 701, 990 A.2d 730 (2010). The goal of insurance contract interpretation is "to ascertain the intent of the parties as manifested by the language of the written instrument." *Madison Const. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 606, 735 A.2d 100, 106 (1999). "[A] court is required to give effect to such language, if

unambiguous, but to interpret it in favor of the insured, if otherwise." ***Lititz Mut. Ins. Co. v. Steely***, 567 Pa. 98, 104, 785 A.2d 975, 978 (2001).

Ambiguity in a contract exists "if the language at issue could reasonably be construed in more than one way." ***Id.*** Nevertheless, "[w]hether ambiguity exists cannot be resolved in a vacuum, …but must instead be considered in reference to a specific set of facts." ***Id.*** In other words, the ambiguity cannot be measured in the abstract; rather, the policy language must be tested against the facts of the case. ***See Wagner v. Erie Ins. Co.***, 801 A.2d 1226 (Pa.Super. 2002), *aff'd*, 577 Pa. 563, 847 A.2d 1274 (2004). No ambiguity exists if after close review, it appears that only a lawyer's ingenuity has made the language uncertain. ***Lower Paxton Twp. v. U.S. Fidelity & Guar. Co.***, 557 A.2d 393, 402 (Pa.Super. 1989), *appeal denied*, 523 Pa. 649, 567 A.2d 653 (1989).

"When analyzing a policy, words of common usage are to be construed in their natural, plain, and ordinary sense." ***Continental Cas. Co. v. Pro Machine***, 916 A.2d 1111, 1118 (Pa.Super. 2007). "[W]hen 'the language of the [insurance] contract is clear and unambiguous, a court is required to give effect to that language.'" ***Mitsock v. Erie Ins. Exchange***, 909 A.2d 828, 831 (Pa.Super. 2006) (quoting ***Madison Const. Co., supra*** at 606, 735 A.2d at 106). A court must not distort the meaning of the language or resort to a strained contrivance to find an ambiguity. ***Mitsock, supra***.

> [T]he proper focus regarding issues of coverage under
> insurance contracts is the reasonable expectation[s] of the

> insured. In determining the reasonable expectations of the insured, courts must examine the totality of the insurance transaction involved. However, while reasonable expectations of the insured are focal points in interpreting the contract language of insurance policies, an insured may not complain that [its]…reasonable expectations were frustrated by policy limitations which are clear and unambiguous. Like every other contract, the goal of interpreting an insurance contract is to ascertain the intent of the parties as manifested by the language of the policy.

*St. Paul Mercury Ins. Co. v. Corbett*, 630 A.2d 28, 30 (Pa.Super. 1993) (*en banc*) (internal citations omitted).

Additionally, the insured has the burden to prove a valid policy claim. *Antrim Mining, Inc. v. Pennsylvania Ins. Guar. Ass'n*, 648 A.2d 532, 534 (Pa.Super. 1994), *appeal denied*, 540 Pa. 616, 657 A.2d 487 (1995) (citing *Riehl v. Travelers Insurance Co.,* 772 F.2d 19, 23 (3d Cir. 1985)). On the other hand, where "an insurer relies on a policy exclusion as the basis for its denial of coverage…, the insurer has asserted an affirmative defense, and accordingly, bears the burden of proving such defense." *McEwing v. Lititz Mut. Ins. Co.*, 77 A.3d 639, 646 (Pa.Super. 2013) (quoting *Madison Const. Co., supra* at 605; 735 A.2d at 106). Further, if the policy contains an exception to an exclusion, the burden to prove whether the exception applies falls again on the insured. *Northern Ins. Co. of New York v. Aardvark Assocs., Inc.*, 942 F.2d 189, 194-95 (3d Cir. 1991).

Regarding the existence of a principal-agent relationship, that question is ordinarily one of fact for the jury to determine. *Joyner v. Harleysville Ins. Co.*, 574 A.2d 664, 668 (Pa.Super. 1990), *appeal denied*, 527 Pa. 587,

588 A.2d 510 (1991). Where the facts giving rise to the relationship are not in dispute, however, the question is one which is properly decided by the court. **Breslin by Breslin v. Ridarelli**, 454 A.2d 80, 82 (Pa.Super. 1982).

An agency relationship may be created by any of the following ways:

> (1) express authority, (2) implied authority, (3) apparent authority, and/or (4) authority by estoppel. Express authority exists where the principal deliberately and specifically grants authority to the agent as to certain matters. Implied authority exists in situations where the agent's actions are "proper, usual and necessary" to carry out express agency. Apparent agency exists where the principal, by word or conduct, causes people with whom the alleged agent deals to believe that the principal has granted the agent authority to act. Authority by estoppel occurs when the principal fails to take reasonable steps to disavow the third party of their belief that the purported agent was authorized to act on behalf of the principal.

> *    *    *

> The basic elements of agency are the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking. The creation of an agency relationship requires no special formalities. The existence of an agency relationship is a question of fact. The party asserting the existence of an agency relationship bears the burden of proving it by a fair preponderance of the evidence. In establishing agency, one need not furnish direct proof of specific authority, provided it can be inferred from the facts that at least an implied intention to create the relationship of principal and agent existed.

**V-Tech Services, Inc. v. Street**, 72 A.3d 270, 278–79 (Pa.Super. 2013)

(citing **Walton v. Johnson**, 66 A.3d 782, 786–88 (Pa.Super. 2013)

(citations and quotation marks omitted)).

Instantly, Stonewall's policy provides the following language:

TO INDEMNIFY THE INSURED ANY AND ALL SUMS THE INSURED SHALL BECOME LEGALLY LIABLE TO PAY AS DAMAGES, INCLUDING LIABILITY ASSUMED BY THE INSURED UNDER ANY AGREEMENT OR CONTRACT, TO ANY PERSON OR PERSONS AS COMPENSATION FOR:

(1)    PERSONAL INJURY

(2)    PROPERTY DAMAGE

(3)    EVACUATION EXPENSES

TO REIMBURSE THE INSURED FOR COSTS PAID OR INCURRED BY THE INSURED IN CONNECTION WITH PERSONAL INJURY, PROPERTY DAMAGE OR EVACUATION EXPENSES ARISING OUT OF AN OCCURRENCE TO WHICH THIS POLICY APPLIES.  SUCH COSTS ARE PAYABLE IN ADDITION TO ANY LIMIT OF INSURER'S LIABILITY FOR ULTIMATE NET LOSS, BUT THE [INSURER] SHALL NOT BE OBLIGATED TO PAY ANY GREATER PROPORTION OF SUCH COSTS THAN THE AMOUNTS OF ULTIMATE NET LOSS PAYABLE UNDER THIS POLICY BEARS TO THE TOTAL OF ALL ULTIMATE NET LOSS RESULTING FROM SUCH OCCURRENCE.

ARISING OUT OF ANY OCCURRENCE OR OCCURRENCES CAUSED BY OR GROWING OUT OF THE INSURED'S OPERATIONS ANYWHERE IN THE WORLD, AND OPERATIONS INCIDENTAL THERETO.

(CRL 1985 Policy at 2; R.R. at 001417a).  The policy defines "occurrence" as "an event, or continuous repeated exposure to conditions which cause personal injury, property damage or evacuation expenses."  (*Id.* at 3; R.R. at 001418a).  The policy defines "property damage" as "(1) physical injury to or destruction of tangible property (other than property owned by the named insured) which occurs during the policy period, including loss of use thereof at

any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period, but (2) above shall not include evacuation expenses." (*Id.* at 4; R.R. at 001419a).

In preparation for analyzing the application of Stonewall's policy to the Elkhart site, the trial court relied on its interpretation of the substantially similar "Operations Clause" in Continental's policy, as follows:

> The acquired assets at issue here are parcels of real property located in several states that suffer from environmental contamination for which Conrail has been found liable under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"). Under CERCLA, a current owner or operator of a contaminated site may be held strictly and wholly liable for the environmental clean-up of the site, even if the causes of that contamination predate its ownership or operation of the site.

> \* \* \*

> [T]he opening provisions of the [p]olicies [provide]:

> > TO INDEMNIFY THE INSURED FOR ANY AND ALL SUMS THE INSURED SHALL BECOME LEGALLY LIABLE TO PAY AS DAMAGES, INCLUDING LIABILITY ASSUMED BY THE INSURED UNDER ANY AGREEMENT OR CONTRACT, TO ANY PERSON OR PERSONS AS COMPENSATION FOR:

> > \* \* \*

> > (b) DAMAGE TO OR DESTRUCTION OF PROPERTY, INCLUDING LOSS OF USE THEREOF, EXCLUDING INSURED'S OWN PROPERTY BUT INCLUDING PROPERTY OF OTHERS IN INSURED'S CARE, CUSTODY OR CONTROL;

- 26 -

* * *

ARISING OUT OF ANY OCCURRENCE OR OCCURRENCES CAUSED BY OR GROWING OUT OF THE INSURED'S OPERATIONS ANYWHERE IN THE WORLD, AND ALL OPERATIONS INCIDENTAL THERETO.

The [p]olicies further provide that the "Named Insured" is Conrail, and "[o]ccurrence means an event, or continuous or repeated exposure to conditions which cause injury or damage during the term of the policy."

* * *

In 1976, when the first [p]olicies were executed, CERCLA did not yet exist, so such far[-]reaching environmental liability was not contemplated by Conrail and its insurers. Conrail had expressly disclaimed assumption of its predecessor's liabilities in its acquisition agreements, and the [p]olicies did not include such predecessors in their definition of the "Insured."

In enacting the Rail Act, Conrail's enabling legislation, Congress intended for Conrail to get a "fresh start" with a "clean slate." Then, in 1980, Congress enacted CERCLA and radically changed the legal landscape in which Conrail and its insurers had been operating.

CERCLA was enacted to ensure that hazardous pollutants which had accumulated in the nation's land and water through decades of industrial activity were removed, contained, or otherwise remediated. Under CERCLA, the government may opt to pursue only one potentially responsible party for the entire cost of the clean-up, and that party must then seek contribution from other responsible parties. In this case, Conrail has apparently settled or entered into tolling agreements with respect to its contribution claims against the reorganized Penn Central, so it does not have to shoulder the entire burden of the clean-up costs alone. However, there may be other potentially responsible parties who are defunct, insolvent, or otherwise unable to contribute their fair share to the clean-up costs, so Conrail may have to cover their portion too.

As noted by Judge Wisdom of the Special Regional Rail Reorganization Court, there is a potential conflict between the Rail Act's fresh start policy and CERCLA's broad liability provisions. However, he found that

CERCLA takes precedence over this general fresh start policy because Congress specifically stated that CERCLA liability arises "[n]otwithstanding any other provision or rule of law." In a conflict, CERCLA prevails. [As a result,] the fresh start policy may work to limit [Conrail's] liability to post-conveyance contamination; it does not, however, affect our decision to leave for the district courts the decision whether to impose joint and several liability [on Conrail under CERCLA].

In reaching this conclusion, Judge Wisdom recognized that where the environmental harm caused by several potentially responsible parties is not clearly divisible, joint and several liability may be imposed, and, as a result, Conrail may end up paying for contamination that was caused by others, prior to 1976. However, just because Conrail may be found liable to pay for the clean-up of pollution that was not caused by its own operations, that does not necessarily mean its general liability insurers must reimburse it for such costs under the [p]olicies.

\* \* \*

The language of the [p]olicies makes clear that the insurers will reimburse Conrail only for the damages (clean-up costs) arising out of an occurrence (environmental contamination) that was caused by or grew out of Conrail's operations. Where Conrail's CERCLA liability is premised solely upon its status as a current, passive owner of the contaminated site, and not as a polluting operator, then the pre-existing environmental condition giving rise to the damages for which indemnification is sought by Conrail was not caused by, nor did it grow out of, Conrail's railroad operations. However, where Conrail contributed to that condition, *i.e.*, the contamination, by discharging some of the pollutants itself, then the occurrence giving rise to the damages for

which Conrail seeks indemnification was caused by and grew out of Conrail's operations.

The [p]olicies do not require that the damages incurred by Conrail arise out of an occurrence caused solely or wholly by Conrail. Nor do they expressly provide coverage for damages caused in part by Conrail's operation. However, the phrase "growing out of" Conrail's operations can reasonably be interpreted to include contamination caused only partially by Conrail. Therefore, where Conrail is liable because it caused some of the pollution itself, the insurers must provide coverage for the entire amount of damages that Conrail must pay, even if some of the damages arose out of pollution that was caused by other entities.

This result is somewhat unusual—where Conrail did nothing wrong, it is not covered, but where it is at least partially at fault, it is entirely covered. However, that is the result dictated by a plain reading of the language of the Operations Clause at issue.

(Trial Court Opinion, filed November 13, 2013, at 1-7) (footnotes omitted).

Regarding the specific issue of coverage under Stonewall's policy, the trial court applied its analysis of Continental's similar policy language to the facts of the Elkhart site contamination and Stonewall's policy as follows:

In this case, Conrail has the burden of proof with respect to the general coverage language of the [p]olicies. In other words, Conrail must show that it had to pay money damages to third parties for physical injury to or destruction of their tangible property, which injury or destruction occurred during the policy period 1985-1986 and was caused by an event, or continuous or repeated exposure to conditions, which event or conditions were caused by or grew out of Conrail's operations.

Conrail has failed to meet its burden with respect to the Elkhart [s]ite because the one documented spill of [$CCl_4$] occurred before Conrail came into existence and there were no specific spills of TCE identified for the [p]olicy year at issue here. The evidence regarding the alleged dumping of

- 29 -

solvents by Conrail employees at the car shop at Elkhart does not identify what solvent/degreaser was purportedly spilled, although Conrail speculates that it was something "like TCE." Conrail therefore cannot prove that its dumping activities caused the specific contamination that it was forced to pay to remediate at Elkhart. Furthermore, no year was identified in connection with those vaguely remembered occurrence(s). As a result, Conrail cannot show an event, or continuous or repeated exposure to conditions, which caused injury or destruction to a third party's property during the term of the [p]olicies at issue here.

(Trial Court Opinion, filed October 28, 2014, at 4) (footnotes omitted).

Regarding the specific issue of coverage under Continental's policy, the trial court applied its analysis of Continental's policy language to the facts of the Hollidaysburg, Elkhart, Douglasville, Conway, Beacon, and Paoli sites as follows:

In this case, Conrail has the burden of proof with respect to the Operations Clause and the other general coverage language of the [p]olicies. In other words, Conrail must show that it had to pay money damages as compensation for physical damage to a third party's property arising out of an event, or continuous or repeated exposure to conditions, which caused injury or damage during the term of the policy, which event or conditions were caused by or grew out of Conrail's operations.

* * *

Conrail has…failed to meet its burden with respect to the Elkhart [s]ite because the one documented spill of [$CCl_4$] occurred before Conrail came into existence and there were no specific spills of TCE identified for any of the [p]olicy years at issue here. The alleged dumping of solvents by Conrail employees at the car shop at Elkhart is not covered because no year was identified in connection with those vaguely remembered occurrence(s). As a result, Conrail cannot show "an event, or continuous or repeated exposure to conditions which cause injury or damage during the tern

- 30 -

of" any of the [p]olicies at issue here. Furthermore, the evidence cited by Conrail does not identify what solvent/degreaser was purportedly dumped at the car shop, although Conrail speculates that it was something "like TCE."

Conrail failed to meet its burden with respect to the Control Tower [a]rea at the Beacon [s]ite because Conrail has not shown that any spill occurred at that [s]ite during its tenure there.

Conrail has also failed to show an occurrence caused by its operations and causing damage within the term of any [p]olicy prior to the 1981 oil spill at the Charles River Chamber [a]rea at Beacon [s]ite, prior to the 1977 oil spill at the Conway site, and prior to a 1979 PCB spill at the Paoli [s]ite, so the [p]olicies for the years prior to those occurrences are not implicated at those [s]ites. Douglasville is the only [s]ite for which Conrail appears to have met its burden of proof regarding relevant occurrences implicating all Continental [p]olicies because there is no dispute between the parties that Conrail sent its waste oil there between 1976 and 1985.

[Continental] argue[s] with respect to the Douglasville oil recycling [s]ite that there is no coverage because Conrail did not contribute to the pollution by discharging some of the waste there itself. However, the Operations Clause in the [p]olicies provides coverage not only for occurrences directly "caused by" Conrail's operations, but also occurrences "growing out of the insured's operations anywhere in the world, and all operations incidental thereto." The mistreatment of Conrail's waste, which it sent to a third party for recycling or disposal, necessarily grows out of Conrail's operations and is incidental thereto.

If Conrail fails to meet its burden of proof as to coverage with respect to a specific site, then [Continental's] summary judgment motions must be granted. Summary judgment will therefore be granted in favor of [Continental] with respect to the Hollidaysburg and Elkhart [s]ites, the Control Tower [a]rea at the Beacon [s]ite, the pre-1981 [p]olicies at the Charles River Chamber [a]rea of the Beacon [s]ite,

the pre-1977 [p]olicies at the Conway site, and the pre-1979 [p]olicies at the Paoli [s]ite.

With respect to the 1981 occurrence at the Charles River/Beacon [s]ite, the 1977 and 1979 occurrences at the Conway [s]ite, and the multiple occurrences at Paoli beginning in 1979, [Continental] contend[s] that Conrail has failed to show that the costs it paid for more general site-wide clean-up long after each specific spill occurred arose out of those occurrences. [Continental] argue[s] that each such occurrence was promptly remediated by Conrail at the time it happened, or shortly thereafter. In [Continental's] view, those specific, immediately remediated, spills did not contribute to the general pollution of the [s]ite which Conrail eventually had to pay to remediate.

[Continental's] argument raises disputed issues of fact as to whether each of the specifically identified occurrences was a contributing cause of the larger [s]ite pollution that ultimately had to be remediated at great cost to Conrail and others. This is a battle for the experts to fight at trial, not for the court to resolve now as a matter of law.

[Continental] also argue[s] that the documented spills at the Paoli [s]ite were *de minimus* compared to the decades of PCB burps and drips that preceded Conrail's take-over of the Paoli [s]ite. Similarly, [Continental] argue[s] that Conrail's oil spills at Conway and Beacon Park [were] *de minimus* compared to the overall pollution at the [s]ites. The [p]olicies do not speak to *de minimus* occurrences. Instead, they provide coverage for property damage arising out of "any occurrence" arising out of Conrail's operations. Therefore, if the spills that occurred on Conrail's watch were a contributing cause to the environmental damage later remediated at the Conway, Beacon Park and Paoli [s]ites, then they are covered occurrences under the [p]olicies.

For now, the court can rule only that Conrail has shown occurrence(s) potentially covered by the [p]olicies beginning in 1981 at the Charles River/Beacon [s]ite, in 1977 at the Conway [s]ite, in 1979 at the Paoli [s]ite, and in 1976 at Douglasville.

With respect to the [s]ites and [p]olicies for which Conrail has shown a potentially covered occurrence, the burden then shifts to [Continental] to show that each occurrence at each [s]ite falls within the "Pollution Exclusion." Since all such occurrences involve the discharge, dispersal, release or escape of pollutants, [Continental has] met [its] initial burden. With respect to the [p]olicies in effect from 1985-1986 and onward, which contain no Exception to the Pollution Exclusion, the inquiry ends, and summary judgment must be granted in favor of [Continental] with respect to all remaining [s]ites and those post-1985 [p]olicies.

However, the [p]olicies in effect from 1976-1985 contain a "sudden and accidental" or "accidental" Exception to the Pollution Exclusion, which this court has previously ruled are both synonymous with the term "unexpected and unintended." While the burden of proving an exception to an exclusion may fall on the insured, in this case that initial burden is easily met with a description of the nature of the occurrence and Conrail's assertion that it did not expect or intend the occurrence. Such assertions of innocence are subject to the **Nanty-Glo** rule[1] and preclude a grant of summary judgment.

As a practical matter, the burden then, necessarily, shifts to [Continental] to proffer evidence that the polluting discharge was expected or intended. For instance, [Continental] contend[s] that the PCB railcar burps that occurred at the Paoli site were expected and intended because the railcars were designed by General Electric to release PCB laden oil in the event of overheating or other equipment malfunction, and they regularly did so. The question of whether such designer-induced burps were expected or intended by Conrail is an issue of fact for trial. Furthermore, not all of the spills documented at the Paoli site during Conrail's tenure were burps, so some of these

_____

[1] **See Borough of Nanty-Glo v. American Surety Co. of New York**, 309 Pa. 236, 163 A. 523 (1932) (holding oral testimony of moving party, even if uncontradicted, will not afford sufficient basis for entry of summary judgment because credibility of testimony is for jury to decide).

spills may well prove to have been unexpected and unintended.

[Continental] also argue[s] that the improper disposal of waste materials at Douglasville was expected and intended because Berks Associates did it deliberately. However, the proper test is whether the insured, Conrail, expected or intended the release of waste oil at the [s]ite, not whether a third party, who is a stranger to the [p]olicies, did. Since Conrail's employees claim they did not know of, expect, or intend Berks' apparently purposeful polluting activities, Conrail's knowledge, expectation, and intent become issues of fact for trial.

[Continental] further argue[s] that coverage is barred at the Beacon, Conway and Paoli [s]ites, by the "Known Loss Doctrine," *i.e.*, that Conrail knew the [s]ites were polluted when it acquired them and therefore knew that they were polluted when it applied for the [p]olicies at issue here. Under the Known Loss Doctrine, the question for trial is "whether the evidence shows that the insured was charged with knowledge which reasonably shows that it was, or should have been, aware of a likely exposure to losses which would reach the level of coverage" provided by the [p]olicies at issue.

Conrail asserts that it did not know, during the 1976 through 1985 period when it applied for the [p]olicies here, the extent of the loss or damages it would later be required to pay for remediation of the contamination, much of which was caused by others before Conrail even came into being. Whether that is a true statement is for the finder of fact to determine.

[Continental's] final argument is that any fines and penalties Conrail paid in connection with any of the [s]ites are not recoverable under the [p]olicies because they do not constitute "damages" paid by Conrail as "compensation for…damage or destruction of property" and coverage for them is barred as a matter of public policy.

With respect to the [Charles River/Beacon, Conway, Paoli, and Douglasville s]ites, Conrail paid approximately $1.2 million to governmental entities in connection with the

- 34 -

clean-up at the Conway [s]ite only. Of this amount, [Continental] contest[s] coverage with respect to $616,000 in civil penalties Conrail paid to the PaDEP and $91,200 it paid to the Borough of Conway.

Both the state and local fines Conrail paid were assessed as "penalties" and were in addition to the costs Conrail was required to incur for corrective or remedial action, *i.e.*, clean-up and prevention of further violations. Since the state legislature and the municipality termed them "penalties," the intent was to punish Conrail rather than compensate other property owners for damage. The [p]olicies allow for the recovery only of amounts paid as "compensation." Furthermore, Pennsylvania law prohibits the recovery of punitive or penal damages under insurance policies like the ones at issue here. Therefore, Conrail is not entitled to recover from [Continental] the civil penalties it paid to the PaDEP and the Borough of Conway.

(Trial Court Opinion, filed October 28, 2014, at 12-19) (footnotes omitted).

We see no reason to disrupt the court's sound analysis regarding the interpretation of the insurance policy language and the application of the language to the sites in question. **See Chenot, supra**; **Wagner, supra**; **St. Paul Mercury Ins., supra.** **See also Antrim Mining, Inc., supra**; **McEwing, supra**; **Northern Ins. Co. of New York, supra**. Consequently, Conrail's first issue on appeal merits no relief.

Regarding Conrail's second issue, that the trial court incorrectly found Conrail did not damage third-party property, even if Conrail did damage third-party property by polluting groundwater at the Hollidaysburg site, Conrail is still not entitled to relief. As the insured, Conrail bears the burden to prove a valid policy claim. **See Antrim Mining, Inc., supra**. We observe nothing in the record to indicate the groundwater pollution occurred during any of the

- 35 -

policy years at issue in this case. Therefore, assuming without deciding the polluted groundwater constituted damage to third-party property, Continental would not be responsible for indemnification. **See id.** Accordingly, Conrail's second issue merits no relief.

With respect to Conrail's third claim on appeal, we observe an issue of fact arguably exists regarding the existence of a principal-agent relationship between Mr. Ambriano and Lloyd: Mr. Ambriano stated that he understood he was authorized to sign the Lloyd policy; EWI, Conrail's broker, dealt with Mr. Ambriano; Mr. Ambriano was the sole and exclusive agent for all of PLAR's business in the United States; Lloyd was a PLAR member; the majority of the of-record policies issued by PLAR were direct policies; PLAR negotiated policies for individual members; and Mr. Ambriano was highly regarded in the international insurance industry. **See Chenot, supra**; **Joyner, supra**; **Breslin, supra**. Despite the issue of fact, we note the finding of such a relationship is irrelevant regarding the Elkhart, Hollidaysburg, Beacon, and Conway (prior to the 1977 oil spill) sites. Lloyd's purported policy only covered "occurrences" on all of Conrail's sites from April 1, 1978, to April 1, 1979, and the contamination that occurred at the Elkhart, Hollidaysburg, Beacon, and Conway (prior to the 1977 oil spill) sites falls outside of the policy coverage based on the court's foregoing application of its interpretation of Continental's similar policy language to the sites at issue on appeal. Therefore, Conrail's argument regarding the existence of a principal-agent relationship as it

pertains to the Elkhart, Hollidaysburg, Beacon, and Conway (prior to the 1977 oil spill) sites merits no relief.

With respect to the Douglasville, Paoli, and Conway (after the 1977 oil spill) sites, however, Lloyd's purported policy may be implicated if the "occurrences" happened within the policy period. In order to determine whether Lloyd is required to indemnify Conrail for any "occurrences" under a binding insurance contract, a finder-of-fact must first decide if a principal-agent relationship existed between Mr. Ambriano and Lloyd. Based on this record, we observe an issue of fact exists with regard to Mr. Ambriano and Lloyd's alleged principal-agent relationship. **See Chenot, supra**. Because the facts regarding the existence of a principal-agent relationship are in dispute, this issue is for the fact-finder. **Joyner, supra**; **Breslin, supra**.

Based on the foregoing, we conclude Conrail produced sufficient facts to defeat summary judgment on the question of whether there was a principal-agent relationship between Mr. Ambriano and Lloyd. Accordingly, we reverse summary judgment on this claim and remand for further proceedings.

Judgment affirmed in part, reversed in part, and case remanded for further proceedings. Jurisdiction is relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/23/18