J-E01002-22

2022 PA Super 204

| | | |
|---|---|---|
| TIMOTHY A. UNGAREAN, DMD D/B/A SMILE SAVERS DENTISTRY, PC, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED PERSONS | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| | : | No. 490 WDA 2021 |
| CNA AND VALLEY FORGE INSURANCE COMPANY | : : : : : | |
| Appellants | : | |

Appeal from the Order Entered March 26, 2021
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD-20-006544

| | | |
|---|---|---|
| TIMOTHY A. UNGAREAN, DMD D/B/A SMILE SAVERS DENTISTRY, PC, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED PERSONS | : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | |
| | : | No. 948 WDA 2021 |
| CNA AND VALLEY FORGE INSURANCE COMPANY | : : : : : | |
| Appellants | : | |

Appeal from the Order Entered March 26, 2021
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD-20-006544

BEFORE: PANELLA, P.J., BENDER, P.J.E., BOWES, J., LAZARUS, J., STABILE, J., KUNSELMAN, J., NICHOLS, J., McLAUGHLIN, J., and KING, J.

OPINION BY PANELLA, P.J.:           **FILED: NOVEMBER 30, 2022**

Like so many other businesses, the dental practice of Timothy Ungarean, DMD, d/b/a Smile Savers Dentistry, PC ("Ungarean") suffered significant losses when business was disrupted by the COVID-19 pandemic. Ungarean sought coverage for those losses under the business interruption provisions of the business insurance policy he had bought from CNA and Valley Forge Insurance Company ("CNA") ("CNA Policy"). After CNA denied his claim, Ungarean filed a complaint seeking a declaration under the Declaratory Judgments Act, 42 Pa.C.S.A. §§ 7531-7541, that the CNA Policy covered his loss. Ungarean followed that complaint with a motion for summary judgment, which the Allegheny County Court of Common Pleas granted. The court declared Ungarean was entitled to business interruption coverage because COVID-19 and the related governmental orders had caused Ungarean to suffer a direct physical loss of his dental practice, which was within the ambit of coverage provided by the CNA Policy. Moreover, the court found that the exclusions CNA tried to invoke to deny coverage were not applicable to Ungarean's claim.

We are in full agreement with the court's conclusions. We are also in full agreement with the court's reasoning in support of those conclusions. Therefore, based primarily on the trial court's thoughtful opinion, we affirm the court's order granting summary judgment and declaring that coverage is

owed to Ungarean for his COVID-related business losses under the specific terms of the CNA Policy.[1]

The bulk of the factual background leading to this appeal is uncontroverted. Ungarean owns and operates a dental practice, with an office in Pittsburgh and an office in Aliquippa. The practice of dentistry necessarily requires close contact not only between the dentist and his patients, but also between the patients and various staff at the office.

To protect himself from unforeseen interruptions of his practice, Ungarean procured an insurance policy from CNA that provided coverage for certain losses associated with the dental practice during the year from April 1, 2019, to April 1, 2020. In March 2020, the state of Pennsylvania was struck by the full force of the COVID-19 pandemic. COVID-19 is a novel contagious virus that can cause severe acute respiratory illness. In the first three months of the pandemic, it killed thousands of Pennsylvanians, and over 100,000 people nationwide.

After consulting with public health experts, Governor Tom Wolf issued several orders in March 2020 directing that all non-essential businesses should close until further notice. Further, the Governor issued an order directing the residents of Allegheny County, which contains the city of Pittsburgh, to stay at home.

---

[1] Given our reliance on the trial court's opinion, we have attached a copy of that opinion to this one.

In addition to these shutdown orders, public health officials implemented masking and social distancing protocols. Even those businesses that were deemed essential were required to modify their business models by decreasing the number of people allowed in buildings and requiring people to remain masked. Furthermore, in these early months, enhanced cleaning protocols were implemented due to fears that the virus could linger for days on hard surfaces.

As a result of the pandemic, Ungarean was forced to close his dental practice to the public except for emergency dental procedures. He claims this caused a drastic loss in income from the practice, causing him to furlough employees and suffer other harmful consequences. As a result, Ungarean filed a claim with CNA for these losses under the CNA Policy which provides coverage for, *inter alia*, loss of business income due to the physical loss of or damage to covered property. CNA denied coverage on the basis that Ungarean's dental practice did not suffer physical damage.

Ungarean filed a class action complaint asserting one count of relief under the Declaratory Judgments Act. **See** Complaint, 6/5/20, at ¶ 77. In essence, Ungarean sought a declaration that his pandemic-related business losses were covered under the CNA Policy's Business Income, Extra Expense and Civil Authority provisions. **See id.** at ¶¶ 7, 31, 34. Ungarean subsequently filed a motion for summary judgment, which the trial court granted on the basis that Ungarean had, in fact, suffered a direct physical loss of his dental

practice and was therefore owed business insurance coverage under the policy.[2] CNA filed a timely notice of appeal and raises two issues:

> 1. Whether [Ungarean] is entitled to business insurance coverage under the [CNA Policy] as a result of the Covid-19 pandemic and associated orders issued by Governor Wolf where [Ungarean] did not suffer "direct physical loss of or damage to" property and no order, issued as a result of "direct physical loss of or damage to" property, prohibited access to [Ungarean's] property, which are required to trigger coverage under the policy?
>
> 2. Whether the Contamination, Consequential Loss, Fungi, Wet Rot, Dry Rot, and Microbes, and Acts of Decisions, Ordinance or Law exclusions in the [CNA Policy] bar coverage for [Ungarean's] alleged losses related to the Covid-19 pandemic and associated orders issued by Governor Wolf?

Brief for Appellant at 2 (trial court's answers and suggested answers omitted).

At the core, CNA challenges the trial court's declaration under the Declaratory Judgments Act that Ungarean was entitled to coverage under the CNA Policy. "The purpose of the Declaratory Judgments Act is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations[.]" **Allen**, 692 A.2d at 1092-93. "In reviewing a

_____

[2] The same order denied the cross-motion for summary judgment that CNA had also filed. Normally, the denial of a motion for summary judgment is not a final order and therefore is not immediately appealable as a collateral order. **See** Pa.R.A.P. 341. However, in the context of an action under the Declaratory Judgments Act, the trial court's order denying CNA's motion for summary judgment is part and parcel of its order declaring that Ungarean was entitled to coverage under his insurance policy with CNA. Therefore, both the grant of summary judgment to Ungarean and the denial of summary judgment to CNA constitute final orders in this matter. **See Gen. Acc. Ins. Co. of America v. Allen**, 692 A.2d 1089, 1095 (Pa. 1997). Historically, courts often resolve insurance coverage disputes under the Declaratory Judgments Act through summary judgment. **See Kline v. Travelers Pers. Sec. Ins. Co.**, 223 A.3d 677, 685 (Pa. Super. 2019).

declaratory judgment action, we are limited to determining whether the trial court clearly abused its discretion or committed an error of law." **Kline**, 223 A.3d at 684. We review the trial court's decision "as we would a decree in equity." **Id**. As such, we defer to the factual findings of the trial court unless they are unsupported in the record. **See id**. In contrast, we give no such deference to the trial court's application of the law. **See id**.

In this action, Ungarean sought to settle whether the CNA Policy covered his losses arising from the COVID-19 pandemic. This presents a question of law for our review. **See Kramer v. Nationwide Prop. and Casualty Ins. Co.**, 271 A.3d 431, 436 (Pa. Super. 2021). In conducting that review, we are mindful that "disputes over coverage must be resolved only by reference to the provisions of the policy itself." **Id**. (citation omitted). It is therefore imperative that we look to the text of the CNA Policy, because just as in every case in which an insured claims business related losses caused by COVID-19, each individual policy must be examined based solely on its own language.

<u>Business Income and Extra Expense Provisions</u>

The trial court first found that Ungarean was entitled to coverage under the CNA Policy's Business Income and Extra Expense provisions, which state in relevant part:

> 1.b. We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. …

> 2.a. Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

CNA Policy, Business Income and Extra Expense Endorsement, at 1.b., 2a. The policy defines "suspension" as "[t]he partial or complete cessation of your business activities; or … [t]hat a part or all of the described premises is rendered untenantable." CNA Policy, Businessowners Special Property Coverage Form, at G.29. Further, the policy defines "operations" as "the type of your business activities occurring at the described premises and tenantability of the described premises." *Id.*, at G.19.

"Direct physical loss of or damage to"

The provisions provide coverage for the loss of business income and extra expenses incurred due to the suspension of an insured's operations caused by a "direct physical loss of or damage to" the covered property. **See** CNA Policy, Business Income and Extra Expense Endorsement, at 1.b., 2a. As the trial court makes clear, whether Ungarean's claim is covered under these provisions of the CNA Policy hinges on the meaning of the phrase "direct physical loss of or damage to property." Trial Court Opinion, 3/25/21, at 10. CNA argues that the phrase necessarily requires a physical alteration to the subject property, and any other interpretation is unreasonable. Ungarean, meanwhile, argues that it is reasonable to interpret the phrase as

encompassing the loss of use of the property even in the absence of actual physical harm to the property.

Importantly, the CNA Policy does not define "direct," "physical," "damage," and, perhaps most significantly in our view, "loss." The trial court therefore turned to the dictionary definitions of these words to determine whether Ungarean's interpretation of the phrase as including the loss of use of his property was a reasonable one. *See Wagner v. Erie Ins. Co.*, 801 A.2d 1226, 1231 (Pa. Super. 2002) (stating that courts may utilize dictionary definitions to inform its understanding of the language of a contract). The court emphasized that this determination was crucial because "if the contractual terms are subject to more than one reasonable interpretation, [the] [c]ourt must find that the contract is ambiguous," and ambiguous provisions must be construed in favor of Ungarean as the insured. Trial Court Opinion, 3/25/21, at 10-11 (*citing Madison Constr. Co. v. Harleysville Mutual Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999), and *Kurach v. Truck Ins. Exchange,* 235 A.3d 1106, 1116 (Pa. 2020)). Ungarean's interpretation of an ambiguous contract need only be reasonable to be controlling. *See Collister v. Nationwide Life Ins. Co.*, 388 A.2d 1346, 1353 (Pa. 1978); *see also Consol. Rail Corp. v. ACE Prop. & Casualty Ins. Co.*, 182 A.3d 1011, 1026 (Pa. Super. 2018).

In finding that Ungarean's interpretation was, at the very least, reasonable considering the ordinary meaning of the operative words, the trial court explained:

> This [c]ourt [begins] its analysis [of what the phrase 'direct physical loss of …. property' reasonably means] with the terms 'damage' and 'loss,' as these terms are the crux of the disputed language. … '[D]amage' is defined as 'loss or harm resulting from injury to person, property, or reputation…' and 'loss' is defined as 'DESTRUCTION, RUIN …[and/or] the act of losing possession [and/or] DEPRIVATION…

> Based upon the above-provided definitions, it is clear that 'damage' and 'loss,' in certain contexts, tend to overlap. This is evident because the definition of 'damage' includes the term 'loss,' and at least one definition of 'loss' includes the terms 'destruction' and 'ruin,' both of which indicate some form of damage. However, [ ]  in the context of this [CNA Policy], the concepts of 'loss' and 'damage' are separated by the disjunctive 'or,' and, therefore, the terms must mean something different from each other. Accordingly, in this instance, the most reasonable definition of 'loss' is one that focuses on the act of losing possession and/or deprivation of property instead of one that encompasses various forms of damage to property, *i.e.,* destruction and ruin. Applying this definition gives the term 'loss' meaning that is different from the term 'damage.' Specifically, whereas the meaning of the term 'damage' encompasses all forms of harm to [Ungarean's] property (complete or partial), this [c]ourt conclude[s] that the meaning of the term 'loss' reasonably encompasses the act of losing possession [and/or] deprivation, which includes the loss of use of property absent any harm to [the] property.

Trial Court Opinion, 3/25/21, at 12-13 (capitalization and some ellipses in original, footnotes citing Merriam-Webster Dictionary for definitions of terms omitted).

The trial court's reasoning is both straightforward and compelling. The CNA Policy provides coverage for "direct physical loss of or damage to the

property. . . ." CNA, as the insurer, wrote that phrase in the disjunctive, meaning that "direct physical loss" must mean something different from "direct physical damage." *See In re Paulmier*, 937 A.2d 364, 373 (Pa. 2007) (stating that "'or' is disjunctive. It means one or the other of two or more alternatives."). The definition of "loss" includes the loss of possession or deprivation of the property, whereas damage does not; it is therefore reasonable to find that "loss of property" includes the act of being deprived of the physical use of one's property. We are convinced the trial court's reasoning is correct, and results in a reasonable interpretation of the CNA Policy. *See Collister*, 388 A.2d at 1353; *Consol. Rail Corp.*, 182 A.3d at 1026.

CNA argues, however, that the trial court's analysis is fatally flawed because it writes the words "physical" and "direct" out of the contract. To the contrary, the trial court explained that it had:

> also considered the meaning and impact of the terms 'direct' and 'physical.' Ultimately, [the court] determined that the ordinary, dictionary definitions of the terms 'direct' and 'physical' are consistent with the above interpretation of the term 'loss.' … '[D]irect' is defined as 'proceeding from one point to another in time or space without deviation or interruption … [and/or] characterized by close logical, causal, or consequential relationship …' and 'physical' is defined as 'of or relating to natural science … having a material existence … [and/or] perceptible especially through the senses and subject to the laws of nature….' Based upon these definitions it is certainly reasonable to conclude that [Ungarean] could suffer 'direct' and 'physical' loss of use of [his] property absent any harm to [the] property.
>
> Here, [Ungarean's] loss of use of [his] property was both 'direct' and 'physical.' The spread of COVID-19, and a desired limitation of the same, had a close logical, causal and/or consequential relationship to the ways in which [Ungarean]

materially utilized [his] property and physical space. … Indeed, the spread of COVID-19 and social distancing measures (with or without the Governor's orders) caused [Ungarean], and many other businesses, to *physically* limit the use of property and the number of people that could inhabit *physical* buildings at any given time. Thus, the spread of COVID-19 did not, as [CNA] contend[s], merely impose economic limitations. Any economic losses were secondary to the businesses' *physical* losses.

Trial Court Opinion, 3/25/21, at 13-14 (emphasis and some ellipses in original, footnotes citing Merriam-Webster Dictionary for definitions of terms omitted).

We agree with the trial court that it is, at a minimum, reasonable to find that Ungarean's loss of the use of his dental practice due to COVID-19 and the governmental orders equated to a direct physical loss of his property. **See Collister**, 388 A.2d at 1353; **Consol. Rail Corp.**, 182 A.3d at 1026. In fact, to say otherwise not only ignores the reality of the impact COVID-19 had on businesses and the world at large but ignores the dictionary definitions of the words in the CNA Policy which, as written, reasonably encompass the direct physical loss of the use of one's property due to COVID-19 and the physical restrictions placed on properties because of it.[3]

_____

[3] Although not applicable here, another way insureds may demonstrate that they have satisfied the "direct physical loss or damage" to covered property is by invoking the contamination theory so aptly explained by another well-reasoned trial court opinion in **SWB Yankees v. CNA Fin. Corp.**, 2021 WL 3468995 (Lackawanna Ct. Com. Pl. August 4, 2021). There, the court explained that if an insured alleges the actual presence of COVID-19 on its property caused the property to become uninhabitable or unusable, it has "adequately alleged 'physical loss or damage' to its property under the contamination theory for purposes of business interruption insurance coverage. **Id.** at *21. Ungarean did not allege that COVID-19 was present in his dental practice.

<u>Period of Restoration</u>

CNA points out, however, that the Business Income and Extra Expense provisions state that CNA will pay for actual loss or reasonable and necessary expenses during the "period of restoration." CNA asserts the definition of "period of restoration" in the policy only lends support to its argument that "physical loss or damage" requires a physical alteration to the property and because that did not happen here, Ungarean did not suffer a direct physical loss of his dental practice. The policy defines "period of restoration" as:

> the period of time that … [b]egins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and … [e]nd on the earlier of … [t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or … [t]he date when business is resumed at a new permanent location.

> Period of restoration does not include any increased period required due to the enforcement of any law that … [regulates the construction, use or repair, or requires the tearing down of any property ; or … [r]egulates the prevention, control, repair, clean-up or restoration of environmental damage.

> The expiration date of this policy will not cut short the "period of restoration."

CNA Policy, Businessowners Special Property Coverage Form, at G.20.

In rejecting CNA's argument, the trial court concluded that the "period of restoration" provisions are most reasonably construed as time limits for coverage, and do not otherwise alter the definition of "physical loss or damage." *See* Trial Court Opinion, 3/25/21, at 15. We agree and are therefore unpersuaded by CNA's argument that the definition of "period of restoration"

should somehow alter our conclusion that Ungarean suffered a physical loss to his dental practice and is consequently entitled to coverage.[4]

<u>"Covered Cause of Loss"</u>

This does not, however, end our analysis as the CNA Policy also states that "[t]he loss or damage must be caused by or result from a Covered Cause of Loss." CNA Policy, Business Income and Extra Expense Endorsement, at 1.b.; **see also id.** at 2.a. ("Extra Expense means reasonable and necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss."). The CNA Policy defines "Covered Causes of Loss" as follows: "RISKS OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded in section B. EXCLUSIONS; b. Limited in paragraph A.4. Limitations; or c. Excluded or limited by other provisions of this policy." CNA Policy, Businessowners Special Property Coverage Form, at A.3. (emphasis in original).

Here, CNA does not raise any argument related to Paragraph A.4 or indicate that the loss was excluded or limited under other provisions of the CNA Policy. Instead, CNA points to a variety of exclusions in Section B of the

---

[4] Furthermore, as the trial court noted, COVID-19 has necessitated many physical changes to business properties that would constitute repairs or rebuilding. **See id.** at 15-16. "Such changes include, but are not limited to, the installations of partitions, additional handwashing/sanitization stations, and the installations or renovation of ventilation systems." **Id**. at 15.

CNA Policy and maintains each of these exclusions relieves it of any obligation to cover Ungarean's lost business income and extra expenses from the pandemic-related loss of his dental practice. These exclusions include contamination; consequential loss; fungi, wet rot, dry rot, and microbes; ordinance or law; government actions; and acts or decisions.

It is well settled that when the insurer relies upon exclusionary language in the policy as a defense, the burden is upon the insurer to prove that the exclusion applies to the facts of the case. *See McEwing v. Lititz Mut. Ins. Co.*, 77 A.3d 639, 646 (Pa. Super. 2013) (stating that the insured has the initial burden of showing a claim falls within a policy's coverage, but the burden then shifts to the insurer to prove the applicability of any exclusions); *Wagner*, 801 A.2d at 1231 (providing that the insurer must show that an asserted exclusion clearly and unambiguously prevents the coverage of a claim). To sustain that burden, CNA "must prove that the language of the insurance contract is clear and unambiguous; otherwise, the provision will be construed in favor of the insured." *Wagner*, 801 A.2d at 1231. Importantly, insurance coverage is interpreted broadly to afford the greatest possible protection to the insured; concomitantly, exclusionary clauses are interpreted narrowly against the insurer. *See Kropa v. Gateway Ford*, 974 A.2d 502, 505-07 (Pa. Super. 2009); *Pecorara v. Erie Ins. Exch.*, 596 A.2d 237, 239 (Pa. Super. 1991).

<u>Ambiguity in Exclusions Provisions</u>

As a preliminary matter, the parties acknowledge that Ungarean seeks coverage under the CNA Policy's Business Income and Extra Expense provisions. The CNA Policy's stated exclusions include four distinct categories of exclusions. *See* CNA Policy, Businessowners Special Property Coverage Form, at B.1.-4. CNA cites to exclusions in the first three categories and wholly ignores that the fourth category expressly limits its application to "Business Income and Extra Expense Exclusions." *Id.* at B.4.

As noted above, when a claim is made under the CNA Policy, coverage under the Business Income and Extra Expense insurance is restricted to situations where "[t]he loss or damage [is] caused by or result from a Covered Cause of Loss." CNA Policy, Business Income and Extra Expense Endorsement, at 1.b., 2.a. "Covered Cause of Loss" broadly cites to Section B. (Exclusions) and does not differentiate between the four categories of Exclusions. *See* CNA Policy, Businessowners Special Property Coverage Form, at A.3.

However, based upon the language in the CNA Policy, an insured, such as Ungarean, could reasonably conclude that the Business Income and Extra Expense Exclusions, as stated in the fourth category, and not the first three categories of exclusions, are the only exclusions which apply to claims under the Business Income and Extra Expense coverage provisions. CNA's contention that all four of the categories of exclusions apply to claims for Business Income and Extra Expense insurance, based upon the definition of "Covered Cause of Loss" and its broad statement citing to Section B.

(Exclusions) as a whole, is unreasonable when considering the express words of the policy. In fact, CNA's interpretation would mean that the inclusion of the words "Business Income and Extra Expense Exclusions" in the CNA Policy was entirely superfluous, amounting to no more than mere surplusage. **See** CNA Policy, Businessowners Special Property Coverage Form, at B.1.-4; **Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.**, 941 A.2d 706, 716 (Pa. Super. 2007) (stating that when courts must choose between two competing interpretations of an insurance policy, "we are bound, as a matter of law, to choose the interpretation which allows us to give effect to all of the policy's language). Such inconsistent language used in relation to different identified forms of exclusions, covered under different provisions of the CNA Policy, necessarily creates an ambiguity in the policy. **See Bishops, Inc. v. Penn Nat. Ins.**, 984 A.2d 982, 992 (Pa. Super. 2009) (finding an ambiguity in an insurance policy based upon contradictory or necessarily inconsistent language in different portions of the policy).

Here, Ungarean purchased the CNA Policy, which provided him with two categories of property insurance—Businessowners Covered Property insurance and Business Income and Extra Expense insurance. Ostensibly, if Ungarean sought coverage under the Businessowners Covered Property insurance, the first three categories of Exclusions would be applicable, but by the plain language of the CNA Policy, the "Business Income and Extra Expense Exclusions" would be inapplicable. Moreover, only with the inclusion of a claim

for loss of business income would the fourth category of exclusions — "Business Income and Extra Expense Exclusions"— be triggered.

When insurance policy language is ambiguous, courts examine whether a finding of coverage is consistent with the objectively reasonable expectations of the insured. *See id.* at 990. In making this determination, courts must examine the totality of the disputed policy language. *See id.*

When viewing the CNA Policy as a whole, and keeping in mind that we must interpret the relevant provisions in favor of the insured and read the exclusionary clauses narrowly against the insurer, we find that the only exclusion applicable to Ungarean's Business Income and Extra Expense insurance claim is the provision for "Business Income and Extra Expense Exclusions".[5]

The CNA Policy defines "Business Income and Extra Expense Exclusions" as follows:

a. We will not pay for:

(1)    Any Extra Expense, or increase of Business Income loss, caused by or resulting from:

(a) Delay in rebuilding, repairing or replacing the property or resuming "operations," due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

---

[5] Although neither party cites to this exclusion, it is well settled that the insurer bears the burden to establish the applicability of any exclusion to deny coverage. *See McEwing*, 77 A.3d at 646.

> (b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations," we will cover such loss that affects your Business Income during the "period of restoration."
>
> b. Any other consequential loss.

CNA Policy, Businessowners Special Property Coverage Form, at B.4.

Here, subsection a. is clearly inapplicable to the facts of this case. Regarding subsection b. — "Any other consequential loss"— the CNA Policy in a separate exclusion defines "consequential loss" as "[d]elay, loss of use or loss of market." CNA Policy, Businessowners Special Property Coverage Form, at B.2.b.

If we were to find that subsection b. of the "Business Income and Extra Expense Exclusions" is applicable to this case, we would necessarily vitiate Business Income and Extra Expense coverage *in its entirety*. **See** Trial Court Opinion, 3/25/21, at 28. Here, as explained above, the CNA Policy can reasonably be interpreted to find that the "loss of property" includes the act of being deprived of the physical use of one's property. Accordingly, the consequential loss exclusion "would effectively eliminate coverage for any kind of loss and/or damage caused by any covered peril." **Id.** Given this result, we cannot conclude that the exclusion for consequential loss under the "Business Income and Extra Expense Exclusions" is applicable so as to prevent coverage.

Based on all of the above, we find that the loss in this case is a "Covered Cause of Loss" as specified in the CNA Policy as none of the exclusions in the

Business Income and Extra Expenses Exclusions category, the only category of Exclusions available to CNA for the Business Income and Extra Expense claim made here, is applicable.

Other Exclusions Under Section B

Nevertheless, even if we were to address CNA's arguments regarding the exclusions in the first three categories of Section B. (Exclusions), we agree with the trial court that none of the cited exclusions apply. First, CNA argues the "Contamination by other than pollutants" exclusion applies to the instant case. *See* Brief for Appellant at 38-39. CNA contends this exclusion applies to any loss resulting from contamination, including mitigation efforts. *See id.* at 38. CNA claims that the losses here are an "indirect" result of COVID-19 contamination. *See id.* at 39.

The contamination exclusion in the CNA Policy precludes coverage for "Contamination by other than pollutants." CNA Policy, Businessowners Special Property Coverage Form, at B.2.d.8. In turn, the CNA Policy defines "pollutants" as follows:

> any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and any unhealthy or hazardous building materials (including but not limited to asbestos and lead products or materials containing lead). Waste included material to be recycled, reconditioned, or reclaimed.

*Id.*, at G.21.

As an initial matter, the contamination exclusion contains an ambiguity, given that it seeks to exclude pollutants while at the same time including

"contaminant" in the definition of pollutants. **See Wagner**, 801 A.2d at 1231 (stating that an ambiguity in the insurance policy must be construed against the insurer). However, setting aside this ambiguity, we agree with the trial court that this exclusion does not apply, and adopt its reasoning supporting that conclusion in full. **See** Trial Court Opinion, 3/25/21, at 21-24. Furthermore, CNA has not established, through any pertinent case law, that an "indirect" connection between the exclusion and the loss renders the exclusion applicable. As noted above, Ungarean neither alleged nor introduced evidence that the COVID-19 virus was present at the dental offices. Accordingly, we reject CNA's contention that the "Contamination by other than pollutants" exclusion prevents coverage of Ungarean's claim.

Next, CNA argues that the consequential loss exclusion applies. **See** Brief for Appellant at 39-41. CNA claims the trial court misinterpreted this exclusion by finding that the exclusion would render the Business Income and Extra Expense coverages illusory. **See id.** at 39-40. To that end, CNA contends that when the trigger for coverage includes a tangible change to the property, and not mere loss of use, the exclusion is not illusory and reinforces its position that a "non-tangible loss of use was never intended to be covered under the policy." **Id.** at 40. In support, CNA cites to various cases interpreting similar language. **See id.** at 40-41.

Given that we have rejected CNA's underlying argument that Ungarean did not suffer a direct physical loss to his dental practices, we likewise reject

this contention which is premised on that underlying argument. Moreover, we do not find any of the cases cited by CNA to be availing, as the "loss of property" language in the CNA Policy, unlike the policies in the cited cases, includes the act of being deprived of the physical use of one's property. Therefore, we also find that the consequential loss exclusion is not applicable.

Next, CNA contends that the "fungi, wet rot, dry rot, and microbes" exclusion applies to this case. *See* Brief for Appellant at 42-43. CNA argues that the trial court's interpretation of the exclusion is tortured and manufactures an ambiguity. *See id.*

We disagree. To the contrary, we agree with the trial court that the exclusion does not apply to the facts of this case and adopt its analysis in full. *See* Trial Court Opinion, 3/25/21, at 24-26. We add that CNA's argument that the trial court manufactured an ambiguity is without merit, given that the CNA Policy defines "microbe" but fails to include *virus* in this definition. *See* *Wagner*, 801 A.2d at 1231 (stating that when construing an insurance policy, courts must construe words of common usage in their natural, plain, and ordinary sense and may inform the understanding of these terms by accounting for their dictionary definitions).[6] Based upon the foregoing, CNA has not met its burden of establishing that this exclusion is applicable.

---

[6] The CNA Policy at issue here does not contain a virus exclusion. If it had, such an exclusion would most likely have ended our inquiry and compelled a conclusion different from the one reached by the trial court and affirmed by this Court.

CNA also attempts to invoke the "Ordinance or Law" exclusion. ***See*** Brief for Appellant at 44-45. CNA asserts that Governor Wolf's COVID-19 orders had the force of law and exclude coverage under that exclusion. ***See id.***

The exclusion states the following:

a. Ordinance or Law

(1) The enforcement of any ordinance or law:

    (a) Regulating the construction, use or repair of any property; or

    (b) Requiring the tearing down of any property, including the cost of removing its debris.

(2) This exclusion applies whether the loss results from:

    (a) An ordinance or law that is enforced even if the property has not been damaged; or

    (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

CNA Policy, Businessowners Special Property Coverage Form, at 1.a.

The inclusion of "construction" and "repair" with "use" indicates "that the exclusion relates to the physical structural integrity of the property." ***Frank Van's Auto Tag, LLC v. Selective Ins. Co. of the Se.***, 516 F. Supp. 3d 450, 461 (E.D. Pa. 2021); ***see also Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.***, 506 F. Supp. 3d 360, 380 (E.D. Va. 2020) ("[I]t is clear that the Ordinance or law Exclusion applies to ordinances related to the structural integrity, maintenance, construction, or accessibility due to the

property's physical structural state, which existed *before*.") (emphasis in original).[7] Here, the physical structural integrity of the properties is not at issue and, thus, the narrow application of this exclusion is unavailable to CNA.

In any event, even if CNA could establish that "use" in the exclusion applies to this case, we agree with the trial court that Ungarean's claim "for coverage is based upon losses and expenses [he] suffered in relation to both 'the Covid-19 pandemic and the actions of the government in response thereto.'" Trial Court Opinion, 3/25/21, at 29 (emphasis omitted). It was "COVID-19 and the related social distancing measures (with or without government orders) [which] directly forced businesses everywhere to physically limit the use of property and the number of people that could inhabit physical buildings at any given time." *Id.* Accordingly, the Ordinance or Law exclusion is not available to CNA on this basis as well.

Finally, CNA baldly raises a claim that the Acts or Decisions and Governmental Actions exclusions are applicable. *See* Brief for Appellant at 44.

The Acts or Decisions exclusion states that the insurer "will not pay for loss or damage caused by or resulting from … acts or decisions, including the failure to act or decide, of any person, group, organization or governmental

---

[7] Such an interpretation is seemingly confirmed by the "Ordinance or Law" endorsement, which states that "[t]he ordinance or law referred to in this Additional Coverage is an ordinance or law that … [r]egulates the demolition, construction or repair of buildings, or establishes zoning or **land use** requirements at the described premises; and … [i]s in force at the time of the loss." CNA Policy, Ordinance or Law, at 2 (emphasis added).

body." CNA Policy, Businessowners Special Property Coverage Form, at B.3.b. Pertinently, if the excluded cause of loss listed in paragraph b. "results in a Covered Cause of Loss, [CNA] will pay for the loss or damage caused by that Covered Cause of Loss." ***Id.***

The plain language of this exclusion conflicts with the definition of Covered Cause of Loss. As noted above, the CNA Policy defines "Covered Causes of Loss" as follows:

> RISKS OF DIRECT PHYSICAL LOSS unless the loss is:
> a. Excluded in section B. EXCLUSIONS;
> b. Limited in paragraph A.4. Limitations; or
> c. Excluded or limited by other provisions of this policy.

***Id.***, at A.3. By the plain language of the CNA Policy, a loss cannot be a Covered Cause of Loss if an exclusion in Section B. applies. However, the Acts or Decisions exclusion will cover an excluded loss if the loss is a Covered Cause of Loss. These two sections are in conflict, as a loss excluded by the Acts or Decisions exclusion would never qualify as a Covered Cause of Loss. Accordingly, the exclusion contains an ambiguity and therefore cannot be used by CNA to deny Ungarean coverage.

Moreover, the Governmental Actions exclusion denies coverage for "loss or damage caused directly or indirectly by … destruction of property by order of government authority." ***Id.***, at B.1.c. Here, the Governmental Actions exclusion does not apply because no governmental authority ordered the destruction of Ungarean's properties.

In sum, as for the exclusions, we find in the first instance that the ambiguity created by Section B. Exclusions means only the fourth category of exclusions, under the heading of "Business Income and Extra Expense Exclusions," is available for CNA to invoke against Ungarean's claim under the Business Income and Extra Expense provisions. None of those exclusions are applicable to Ungarean's claim. Nonetheless, even if the exclusions under the three other Exclusions sections not labeled "Business Income and Extra Expense Exclusions" were available to CNA, we agree with the trial court that those exclusions are also not applicable and cannot absolve CNA of its responsibility to provide coverage for Ungarean's losses.

Therefore, we conclude that the trial court properly declared that CNA was obligated to provide business loss and extra expenses coverage to Ungarean for the direct physical loss of his dental practice that he suffered due to COVID-19 and the governmental orders issued in response to the pandemic.

Civil Authority Provision

The trial court also found that Ungarean was entitled to coverage under the Civil Authority Provision in the CNA Policy, which states:

> When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss.

CNA Policy, Civil Authority, at 1.

As we agree with the trial court that Ungarean has established a claim that he suffered a "physical loss of or damage to covered property," we also agree with the trial court that he has established a claim under the Civil Authority Endorsement. *See* Trial Court Opinion, 3/25/21, at 19-20.

Conclusion

We affirm the trial court's order granting Ungarean's motion for summary judgment and its declaration that Ungarean's direct physical loss to his dental practice is covered by the CNA Policy. We recognize, as CNA has taken great pains to point out, that this conclusion runs against the tide of cases finding an insured was not owed COVID-related business interruption coverage under their policy's provisions. However, as we stressed above, our review must be confined to the CNA policy purchased by Ungarean to determine whether coverage has been triggered. We base our finding that coverage has indeed been triggered on the plain language of the CNA policy, the guiding principle that ambiguities in insurance policies such as the ones we identified in the CNA Policy must be construed in favor of the insured, and the analysis and opinion of the trial court.

Order affirmed.

Judges Lazarus, Kunselman, Nichols, and McLaughlin join the Opinion.

Judge Stabile files a dissenting opinion in which President Judge Emeritus Bender, and Judges Bowes and King join.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  11/30/2022